UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

OTIS ELEVATOR COMPANY )
    Plaintiff; )
  )
v. ) Docket No.
  )
LOCAL 4, INTERNATIONAL UNION )
OF ELEVATOR CONSTRUCTORS; )
MICHAEL LANGER, INDIVIDUALLY, )
and as BUSINESS MANAGER; )
KEVIN McGETTIGAN, INDIVIDUALLY, )  05 11213 NMG
and as BUSINESS REPRESENTATIVE; )
STEVE MORSE, INDIVIDUALLY, and )
as BUSINESS REPRESENTATIVE; )
and all others conspiring, acting in concert )
or otherwise participating with them or )
acting in their aid or behalf, )
  )
    Defendants. )

## DECLARATION OF DOUG CHRISTENSEN

Doug Christensen, being duly sworn, deposes and says as follows:

1.    I am currently employed by Otis Elevator Company as a Regional Field Operations Manager responsible for Otis' New England region, a position I have held since August 1, 2004. Prior to that, I was the Branch Manager for Otis's Shelton, Connecticut Branch Office, a position I held since March 2003. Prior to that, I was employed by Otis as a construction Superintendent in Connecticut from January 1998 through March 2003. Prior to that, I was a maintenance supervisor in Otis's Shelton, Connecticut Office from April 1994 through January 1998. Prior to that, I was employed by Otis as a Field Engineer in New York City from 1988 to 1994. Prior to that, I was employed by Otis as a Elevator Constructor helper beginning in 1984 and continuing until 1987 when I became an Elevator Constructor Mechanic.

2.  On or about April 5, 2005, one of Otis' Mechanics working in Maine, John Gorecki, resigned his union membership in the International Union of Elevator Constructors ("the IUEC") and Local 4, International Union of Elevator Constructors ("Local 4"). (Attached hereto as Exhibit A are copies of the April 5, 2005 resignation letters Mechanic Gorecki sent to the IUEC and Local 4; attached as Exhibit B is the IUEC's April 25, 2005 letter acknowledging Mechanic Gorecki's resignation and stating that the IUEC will not charge Mechanic Gorecki a representation fee). After resigning his union membership, Mechanic Gorecki continued to be employed as a Mechanic by Otis.

3.  I understand that in late April, 2005, Local 4 held a meeting in Maine. Shortly after that meeting, Mechanic Gorecki began to receive harassing messages on his home voice mail and on his cell phone voice mail. For example, on April 29, 2005, at about 9:08 pm, Mechanic Gorecki received the following message:

> (Laughing)
>
> If this is John Gorecki's house
>
> (pause)
>
> ("you're an asshole" said in the background)
>
> you're a scab and a loser far as the Union is concerned.
>
> (pause)
>
> (Talking in background)
>
> All Union members uh are pretty upset with uh John Gorecki if
> this is John Gorecki's number
>
> (laughing)

(Attached as Exhibit C is a transcript of this message).

4.  Otis determined that another employee, Mechanic Mike Chapman, had made at least one of the harassing phone calls. Mechanic Chapman also threatened that if he were

2

assigned to work with Mechanic Gorecki he would make Mechanic Gorecki's life "miserable" and make Otis Territory Manager Scott Fraser's life "miserable." Based on Mechanic Chapman's unprofessional and inappropriate conduct and harassment, Otis issued Mechanic Chapman a written warning dated May 5, 2005 (A copy of this warning letter is attached as Exhibit D)..

5. Thereafter, other Mechanics stated that they did not want to work with Mechanic Gorecki.

6. On or about Friday May 27, 2005, Otis Construction Superintendent Dick Hogue informed Otis Apprentice Eric Smith that he would be assigned to work on a job with Mechanic Gorecki starting the following Monday, May 30, 2005. Apprentice Smith responded that he would be taking a vacation that week and that he would not return until Monday, June 6.

7. During the time of Apprentice Smith's absence, Otis tried to hire an available Apprentice from the Local 4 list of unemployed workers, or "open employment list". One Apprentice, Bob Burpee, initially indicated that he would accept the assignment. Shortly thereafter, however, Apprentice Burpee called to say "I've got personal issues, I can't show up." Apprentice Burpee later spoke with Otis Supervisor Todd Peterson; according to Supervisor Peterson, Apprentice Burpee had spoken twice with Local 4 after receiving the assignment to work with Otis. Apprentice Burpee told Supervisor Peterson that he was afraid he would be "black listed" if he worked with Mechanic Gorecki, and he therefore had to decline the assignment.

8. On Monday, June 6, 2005, Apprentice Smith returned and reported to the Portland office. Upon being informed by Otis Construction Superintendent Dick Hogue that he was being assigned to work with Mechanic Gorecki, Apprentice Smith refused. According to

3

Superintendent Hogue, Apprentice Smith based his refusal on a "promise" he had made to his union borthers and sisters that he would not work with Mechanic Gorecki, and that his promise to other union members was more important than his job. Due to his refusal to perform assigned work, Apprentice Smith received a written warning and was instructed to report to work the next day.

9.  The next day, June 7, 2005, at or about 7:30 a.m., nearly all of the 16 Otis Mechanics and Apprentices who work out of the Portland office arrived at the office (instead of reporting to job sites) and waited in the parking lot. Superintendent Hogue and I went outside to speak with them. The employees stated that they were unhappy with Mechanic Gorecki because he had left the union. The employees asked whether Mechanic Gorecki could be assigned to work on a maintenance route where he could work alone. I emphasized that Otis could not discriminate against Mechanic Gorecki and could not make assignments based on union status; I also emphasized that Otis had the right ot make job assignments. During this meeting the employees also mentioned that they had heard Mechanic Gorecki sometimes carried a gun, and that they were therefore concerned about working with him. I informed them that I would investigate the matter. This meeting then ended, and the employees reported to work.

10.  Superintendent Hogue and I then drove to Bangor, Maine to meet with Mechanic Gorecki to ask him about whether he carried a gun. We met at about 2:00 p.m. Mechanic Gorecki stated that on one occasion after work, his wife picked him up and he offered to give Apprentice Smith a ride to his car. Mechanic Gorecki reported that when his wife picked him up she handed him his gun and holster and he put it on. According to Mechanic Gorecki, Apprentice Smith did not complain or express concern. In fact, the two worked together the following week without incident. Mechanic Gorecki stated that he has a license to carry a

concealed gun, and that he does carry a gun when he is off duty. He stated that he has never carried a gun while on duty, and that he understood Otis's policy against carrying weapons. Superintendent Hogue and I reiterated Otis' policy.

11.    The next day, Wednesday June 8, 2005, at or about 8:00 a.m., Otis' Portland Mechanics and Apprentices again arrived at the office instead of their regular work sites. Superintendent Hogue and I explained what we had learned from our discussion with Mechanic Gorecki. The employees stated that they were standing behind Apprentice Smith and they asked about Apprentice Smith's status. We explained that since he had not reported to work as instructed, he was no longer considered an employee and we assumed he had quit; when Superintendent Hogue called Apprentice Smith to see where he was, Apprentice Smith had reported that he was headed to Boston for another job. The meeting ended about 8:50 a.m. I was not sure whether the employees were going to report to work or not. Shortly thereafter, the employees began to call their supervisors to say that they were not reporting to work. Some employees said they were sick; others stated that they would not return until "this is resolved."

12.    By mid-morning on Wednesday, June 8, 2005, all Local 4 members employed by Otis in Maine were not working.

13.    At or about 9:30 a.m., I called Local 4 Business Manager Langer. I stated that the Local 4 members were not working. He stated that he would make some calls and get back to me. At or about 11:30 a.m., Business Manager Langer left me a message stating that he had "some information" and that I should give him a call. I called him at or about 12:25 p.m.; he did not answer the call, and I left a message stating that I needed to speak with him. I left another message at about 4:30 p.m. asking him to call me and stating that I expected him to tell the Local

5

4 members to return to work. I also mentioned that I heard we might have a work stoppage in New Hampshire, and that a work stoppage there would be unacceptable.

14. Business Manager Langer did not return my call until about 7:15 p.m.. He stated that he spoke with the Local 4 members and based on those conversations he anticipated that they would be at Otis' Portland office to meet with me. He did not state that the employees would return to work. He added that there "should not be a problem" in New Hampshire.

15. On Thursday, June 9, 2005, all Local 4 members employed by Otis in Maine again refused to report to work, most of them claiming to be sick.

16. Due to the work stoppage, Otis had no Service or Maintenance Mechanics to respond to service calls or emergency calls ("call backs"). In the Portland area, Otis receives on average 15 to 20 call-backs per day. Throughout the day on Wednesday, June 8, Otis received 10 calls; although some supervisors responded to some of these calls, Otis' response was delayed and its operations were severely hampered because its few supervisors were unable to respond as efficiently as Otis' normal crew.

17. One of Otis' largest customers, Maine Medical Center, requires a full-time stand-by Mechanic to handle its maintenance needs. Due to Local 4's work stoppage, Otis is unable to meet this obligation, and if the work stoppage continues, Otis' relationship with this important customer could quickly become irreparably harmed. Several other large and important customers require call-backs within 1 hour of the call; absent a full work force, Otis will be unable to satisfy these customers' needs and Otis will lose this business.

18. Many buildings (nearly 200 Otis customers) in the Portland area are single-elevator buildings. If the elevators in these buildings experience mechanical difficulty or failure,

all elevator service will be interrupted. Thus, prompt service is essential. If Local 4's work stoppage continues, Otis will be unable to provide necessary service for these buildings.

19. Otis' customers in Maine include 4 hospitals and nearly 75 nursing homes or assisted living facilities. At one hospital, Maine Medical Center, a single elevator (the "gold" elevator) provides the only access between the emergency room and the operating rooms. In these facilities, prompt service is essential, and an immediate response to an emergency service call for an entrapment or malfunction could well be necessary to avoid serious personal injury or even death.

20. In addition, Otis' Maine customers include a power plant (Florida Power and Light), a paper mill, and a dam that all depend upon properly functioning elevators.

21. In addition, as a result of the work stoppage, all of Otis' construction and modernization jobs have come to a halt.


SWORN to under the pains and penalties of perjury.

Dated: June 9, 2005

Doug Christensen

268 Village Road
Stetson, ME 04488

April 5, 2005

Michael J Langer
IUEC Local 4
945R Morrissey Blvd
Dorchester, MA 02122

Dear Michael J Langer, Business Manager

In the January 2005 Elevator Constructor on page 6, there was a notice that said I had the right to become a nonmember of the union. Therefore, I hereby resign as a member of IUEC Local 4 My resignation is effective immediately. I will continue to meet my lawful obligation of paying a representation fee to the union under its "union shop" agreement with Otis Elevator.

Furthermore, I object to the collection and expenditure by the union of a fee for any purpose other than my pro rata share of the union's costs of collective bargaining, contract administration, and grievance adjustment, as is my right under *Communications Workers v. Beck*, 487 U.S. 735 (1988). Pursuant to *Teachers Local 1 v. Hudson*, 475 U.S. 292 (1986), and *Abrams v. Communications Workers*, 59 F.3d 1373 (D.C. Cir. 1995), I request that you provide me with my procedural rights, including: reduction of my fees to an amount that includes only lawfully chargeable costs; notice of the calculation of that amount, verified by an independent certified public accountant; and notice of the procedure that you have adopted to hold my fees in an interest-bearing escrow account and give me an opportunity to challenge your calculation and have it reviewed by an impartial decision maker.

Please reply promptly to my request. Any further collection or expenditure of dues or fees from me made without the procedural safeguards required by law will violate my rights under the National Labor Relations Act and/or U.S. Constitution.

Sincerely yours,

John Gorecki

Intl:110483
Picket: 1258

06/06/2005  10:13    12072962035           GORECKI                        PAGE  01



**International Union of Elevator Constructors Local Union No. 4**
Boston, MA/Portland, ME
*Affiliated with Building Trades, A F L - C I O*

BUSINESS MANAGER
MICHAEL J. LANGER

BUSINESS REPRESENTATIVE
KEVIN L. McGETTIGAN

BUSINESS REPRESENTATIVE
FINANCIAL SECRETARY
STEVEN A. MORSE



May 15, 2005

John Gorecki
268 Village Road
Stetson ME 04488

Mr. Gorecki:

We have received your letter dated April 5 2005 and have accepted your resignation. After a thorough review of the Locals financial records, we have found that you have paid your first quarter financial obligation and assessment to the Local. Enclosed you will find 2 checks for reimbursement of dues and assessments for the first quarter. As the enclosed letter states, you have been removed from all records of the Local.

Michael J. Langer
Business Manger
Local 4 Boston/Portland

Cc:   K. Stringer IUEC GST
      R. Koerbel IUEC Reg. Dir.

645R MORRISSEY BOULEVARD • DORCHESTER. MA 02122 • Tel: (617) 268-1547 • Fax: (617) 288-6724 • E-mail: local4@iueclocal4.com
ME  VT  NH  1-800-694-6797

*International Union of*
*Elevator Constructors*
*Local Union No. 4*
Boston, MA/Portland, ME

Affiliated with Building Trades, A F L -C I O

**BUSINESS MANAGER**
MICHAEL J. LANGER

**BUSINESS REPRESENTATIVE**
KEVIN L. McGETTIGAN

**BUSINESS REPRESENTATIVE**
**FINANCIAL SECRETARY**
STEVEN A. MORSE



May 15, 2005

John Gorecki
268 Village Road
Stetson ME 04488

Mr. Gorecki:

We have received your letter dated April 5 2005 and have accepted your resignation. After a thorough review of the Locals financial records, we have found that you have paid your first quarter financial obligation and assessment to the Local. Enclosed you will find 2 checks for reimbursement of dues and assessments for the first quarter. As the enclosed letter states, you have been removed from all records of the Local.

Michael J. Langer
Business Manger
Local 4 Boston/Portland

Cc:   K. Stringer IUEC GST
      R. Koerbel IUEC Reg. Dir.

From phone number 1-603-204-8925
Dated April 29, 2005 @ 9:08 pm

Number
(Laughing)
If this is John Gorecki's house
(pause)
("you're an asshole" said in the background)
you're a scab and a loser far as the Union is concerned
(pause)
(Talking in the background)
All Union members uh are pretty upset with uh John Gorecki if this is John Gorecki's number.
(Laughing)

**Exhibit C**

Otis Elevator Company



May 5, 2005

Mr. Mike Chapman
[*ADDRESS*]

Re:   **Article XXII, par. 5(e); Misconduct and Unsatisfactory Performance**

Dear Mike:

As provided for in Article XXII, Par 5(e) of the labor contract between Otis Elevator Company and the International Union Of Elevator Constructors (IUEC), this letter will serve to notify you that you are not fulfilling your responsibilities at a satisfactory level. By copy of this letter you are being placed on notice and being given an opportunity to improve your conduct, behavior and performance.

The improvement in your conduct, behavior and performance must be immediate and sustained. If such improvement is not immediately forthcoming, you will be subject to further discipline, up to and including the termination of your employment with Otis Elevator Company. The following reasons are the basis for our decision:

During the week of April 18, 2005, you told me that you would not work with John Gorecki because he had exercised his right to resign from the Union. When I told you that you could not discriminate against John because of his Union status you became belligerent and said that if I assigned you to work with him you would make John's life miserable and my life miserable. On April 22, 2005, I gave you a verbal warning for insubordination and counseled you that your behavior was unacceptable and unprofessional. Branch Manager Dot Mynahan also spoke to you that day and warned you not to harass or bother John about this issue.

Despite those prior warnings, you left a message on John's answering machine at his house on Friday night, April 29th. Your message was extremely inappropriate and unprofessional. Moreover, your actions were contrary to the specific warnings we had issued to you and are contrary to Otis' obligation to maintain a harassment-free environment for its employees.

Accordingly, please be advised that further incidents of insubordination, harassment or intimidation, or other inappropriate conduct, unprofessional behavior or poor performance may subject you to further discipline, up to and including termination of your employment with Otis Elevator.

Please contact me with any questions.

Sincerely,

Scott Fraser

cc:   Michael Langer

**Exhibit D**