UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OTIS ELEVATOR COMPANY )<br>    Plaintiff; )<br>)<br>v. )<br>)<br>LOCAL 4, INTERNATIONAL UNION )<br>OF ELEVATOR CONSTRUCTORS; )<br>MICHAEL LANGER, INDIVIDUALLY, )<br>and as BUSINESS MANAGER; )<br>KEVIN McGETTIGAN, INDIVIDUALLY, )<br>and as BUSINESS REPRESENTATIVE; )<br>STEVE MORSE, INDIVIDUALLY, and )<br>as BUSINESS REPRESENTATIVE; )<br>and all others conspiring, acting in concert )<br>or otherwise participating with them or )<br>acting in their aid or behalf, )<br>)<br>    Defendants. ) | Docket No.<br><br>05 11213 NMG |

**MEMORANDUM OF PLAINTIFF, OTIS ELEVATOR COMPANY, IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION**

    This memorandum is submitted by Plaintiff, Otis Elevator Company (hereafter "Otis" or the "Company"), in support of its application for a temporary restraining order, order to arbitrate and preliminary injunction pursuant to Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a). The Company asks this Court to enjoin the Defendant Local 4, International Union of Elevator Constructors ("Local 4"), its officers, agents, representatives and members from continuing or engaging in, or threatening to engage in, any strike, work stoppage, refusal to work, slowdown, sit-down or sabotage against the Company and, further, to order the parties to arbitrate the dispute which exists between them.

    The underlying dispute – involving the discipline of two Otis Mechanics – is clearly

DOWNS
RACHLIN
MARTIN PLLC

arbitrable under the collective-bargaining agreement in effect between the Company and the Union. In this instance, however, Local 4 is refusing arbitration and decided instead to stage an unlawful work stoppage. The conduct of the Union and the other Defendants breaches the express provisions of the no-strike clause contained in the applicable collective-bargaining agreement and is causing Otis irreparable injury. This Court should, therefore, enjoin the Defendants from violating the Otis Agreement and order the parties to arbitrate pursuant to their Agreement.

I.   **INTRODUCTION**

   A.   **The Parties and Their Bargaining Relationship**

The Company is engaged in the business of constructing, modernizing, repairing and servicing elevators and escalators throughout the United States. The International Union of Elevator Constructors (the "IUEC") represents elevator constructor Mechanics, Helpers, and Apprentices employed by Otis; IUEC Local 4 ("Local 4") represents elevator constructor Mechanics, Helpers, and Apprentices employed by Otis in the Boston, Massachusetts area.

Since 1987, Otis has entered into a series of five-year collective-bargaining agreements with the IUEC, "for and on behalf of its affiliated local unions . . . ." The most recent agreement between Otis and the IUEC became effective on July 9, 2002, and will remain in full force and effect through July 8, 2007 (the "Otis Agreement").[1] The Otis Agreement covers the terms and conditions of employment of elevator constructor Mechanics, Helpers and Apprentices employed by Otis throughout the United States (except New York City and Vicinity which is covered by a separate agreement with IUEC Local 1).

The Otis Agreement expressly prohibits strikes and concerted refusals to work during the term of the Otis Agreement (Article XIV, Paragraph 1), and provides that any difference or

---

[1] A copy of the Otis Agreement is attached as Exhibit A to the Verified Complaint.

dispute regarding the application and construction of the Otis Agreement shall be resolved under the Otis Agreement's grievance and arbitration procedures (Article XVI). [2]

### B.  The Current Dispute

This dispute arises from the decision by one of Otis' Mechanics working in Maine, John Gorecki, to resign his union membership in the IUEC and Local 4 in April, 2005. Thereafter, Local 4 held a meeting in Maine. Shortly after that meeting (or possibly even during the meeting), Mechanic Gorecki began to receive harassing messages on his home voice mail and on his cell phone voice mail from Local 4 members. For example, on April 29, 2005, at about 9:08 pm, Mechanic Gorecki received the following message:

> (Laughing)
>
> If this is John Gorecki's house
>
> (pause)
>
> ("you're an asshole" said in the background)
>
> you're a scab and a loser far as the Union is concerned.
>
> (pause)
>
> (Talking in background)
>
> All Union members uh are pretty upset with uh John Gorecki if this is John Gorecki's number
>
> (laughing)

(Attached as Exhibit C to the Christensen Declaration is a transcript of this message).

---

[2]  Significantly, the Otis Agreement is substantially the same as the Standard Agreement and the Local One Agreement at issue in two cases cited in Section II of this Memorandum: (1) National Elevator Indus., Inc. v. International Union of Elevator Constructors, AFL-CIO, 776 F.2d 374, 376-77 (1st Cir. 1985); and (2) Elevator Mfrs. Ass'n v. International Union of Elevator Constructors, 342 F. Supp. 372, 373 (S.D.N.Y. 1972). In both decisions, the employer successfully obtained an injunction against an illegal work stoppage. Otis was a member of the National Elevator Industry Inc. ("NEII") and Elevator Manufacturers Association of New York multi-employer associations until 1987.

Otis determined that another employee and Local 4 member, Mechanic Mike Chapman, had participated in at least one of the harassing phone calls. Mechanic Chapman also threatened that if he were assigned to work with Mechanic Gorecki he would make Mechanic Gorecki's life "miserable" and he would make Otis Territory Manager Scott Fraser's life "miserable." Based on Mechanic Chapman's unprofessional and inappropriate conduct and harassment, Otis issued Mechanic Chapman a written warning dated May 5, 2005 (A copy of this warning letter is attached as Exhibit A to the Declaration of Scott Fraser). Soon other Mechanics stated that they did not want to work with Mechanic Gorecki.

On or about Friday May 27, 2005, Otis Construction Superintendent Dick Hogue informed Otis Apprentice Eric Smith that he would be assigned to work on a job with Mechanic Gorecki starting the following Monday, May 30, 2005. Apprentice Smith responded that he would be taking a vacation that week and that he would not return until Monday, June 6.

During the time of Apprentice Smith's absence, Otis tried to hire an available Apprentice from the Local 4 list of unemployed workers, or "open employment list". One Apprentice, Rob Burpee, initially indicated that he would accept the assignment. Shortly thereafter, however, Apprentice Burpee called to say "I've got personal issues, I can't show up." Apprentice Burpee later spoke with an Otis Supervisor and reported that he had spoken with Local 4 after receiving the assignment to work with Otis. Apprentice Burpee stated that he felt "conflicted" because Local 4 had asked him to "think about" whether to work with John Gorecki. He therefore had to decline the assignment.

On Monday, June 6, 2005, Apprentice Smith returned from his vacation and reported to the Portland office. Upon being informed by Otis Construction Superintendent Dick Hogue that he was being assigned to work with Mechanic Gorecki, Apprentice Smith refused. Apprentice

Smith based his refusal on a "promise" he had made to his union brothers and sisters that he would not work with Mechanic Gorecki. Due to this refusal to perform assigned work, Otis issued Apprentice Smith a written warning.

The next day, June 7, 2005, at or about 7:30 a.m., nearly all of the 16 Otis Mechanics and Apprentices who work out of the Portland office arrived at the office (instead of reporting to job sites) and waited in the parking lot. Superintendent Hogue and Regional Field Operations Manager ("RFOM") Christensen spoke with them. The employees stated that they were unhappy with Mechanic Gorecki because he had left the union. The employees asked whether Mechanic Gorecki could be assigned to work on a maintenance route where he could work alone. RFOM Christensen emphasized that Otis could not discriminate against Mechanic Gorecki and could not make assignments based on union status; he also emphasized that Otis had the right to make job assignments.

Meanwhile at the Bangor Maine office, Mechanics arrived and informed Otis Territory Manager Scott Fraser that they were upset because an Apprentice had been disciplined for refusing to work with Mechanic Gorecki. Although the mechanics eventually reported to work, one Mechanic, John Dondero, threatened that "if Eric isn't hired back, word is we're going on strike tomorrow."

The next day, Wednesday June 8, 2005, at or about 8:00 a.m., Otis' Portland Mechanics and Apprentices again arrived at the Portland office instead of their regular work sites. The employees stated that they were standing behind Apprentice Smith. The employees then left, presumably to begin work. Shortly thereafter, however, the employees began to call their supervisors to say that they were not reporting to work. Most employees said they were sick; others stated that they would not return until "this is resolved."

At the Bangor office, when Territory Manager Fraser asked about the employees' intentions, they said "we don't know, we haven't heard." Territory Manager Fraser then gave the mechanics their assignments and they went to work. About a half hour later, however, the Mechanics each called in to say that they were going home claiming to be sick. Two mechanics, John Dondero and Mark Cormier came to the office laughing and chuckling. Mechanic Cormeir stated, "I guess you've heard by now, we're all sick."

By mid-morning on Wednesday, June 8, 2005, no Local 4 members employed by Otis in Maine were working.

At or about 9:30 a.m., RFOM Christensen called Local 4 Business Manager Langer and stated that the Local 4 members were not working. Business Manager Langer promised to make some calls and get back to him. At or about 11:30 a.m., Business Manager Langer left a message stating that he had "some information." RFOM Christensen called back at or about 12:25 p.m. and left a message. RFOM left another message at about 4:30 p.m. asking Business Manager Langer to call him and stating that he expected Business Manager Langer to tell the Local 4 members to return to work. He also mentioned that he heard there might be a work stoppage in New Hampshire, and that a work stoppage there would be equally unacceptable.

Business Manager Langer did not return these calls until about 6:30 p.m.. He stated that he spoke with the Local 4 members and, based on those conversations, he anticipated that the employees would be at Otis' Portland office to meet with RFOM Christensen. He did not state that the employees would return to work. He added that there "should not be a problem" in New Hampshire. Nevertheless, that evening, two employees from the Portland office called Superintendent Hogue and stated that they would not be at work on Thursday. Then, starting at or about 6:30 a.m. on Thursday June 9, 2005, each Local 4 member employed by Otis in Maine

called or indicated that they were sick and would be unable to work.

As a result of Local 4's conduct, Otis' work at four job sites in Local 4's jurisdiction has come to a complete standstill. In addition, none of Otis' service and maintenance mechanics and apprentices (except Mechanic Gorecki) are working in Maine.

## II. ARGUMENT

### A. This Court Has Jurisdiction To Enjoin Defendants' Violation Of The No-Strike Clause And To Order The Parties To Arbitrate

This Court has jurisdiction, pursuant to Section 301(a), Labor-Management Relations Act, 29 U.S.C. § 185(a) (1970), to issue a temporary restraining order, a preliminary injunction, and to order the parties to arbitrate. Section 301(a) provides:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

In Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970), the United States Supreme Court, overruling its earlier decision in Sinclair Refining Co. v. Atkinson, 370 U.S. 195 (1962), held that a federal court may enjoin a strike which is in breach of a no-strike clause where the strike is over a grievance which is arbitrable under the collective-bargaining agreement. The Court specifically held that the Norris-LaGuardia Act does not preclude the issuance of an injunction in this situation. The Court reasoned that national labor policy would be furthered if the parties submitted their dispute to the mutually agreed upon procedures set forth in the collective-bargaining agreement. Specifically, the Court held:

> The Sinclair decision, however, seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices. Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no

2. **The Union Has Breached The No-Strike Provision In The Collective-Bargaining Agreement**

The work stoppage by all Local 4 members throughout the state of Maine constitutes a strike that violates the Agreement's clear and unambiguous no-strike clause. Article XIV, the "No Strike or Lockout" provision of the Agreement, reads in pertinent part:

> It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party.

It is beyond serious dispute that employees' refusals to work is the result of an order from Local 4 and the Union has initiated, authorized and/or ratified after the fact, the unlawful work stoppage in furtherance of its position regarding the discipline of two Mechanics, a dispute which Otis and the Unions are bound to arbitrate pursuant to Article XV of the Agreement. The work stoppage clearly constitutes a strike that breaches the no-strike clause. The First Circuit agrees. Otis Elevator Company, supra; National Elevator Indus., Inc. v. International Union of Elevator Constructors, 776 F.2d 374, 378 (1st Cir. 1985) (citing Elevator Mfrs. Ass'n of New York, Inc. v. Local 1 International Union of Elevator Constructors, 689 F.2d 382, 386 (2d. Cir. 1982)). See also Delta Elevator Servs. v. IUEC, Local 4 et al., Docket No. 02-12145DPW (November 1, 2002) (TRO issued by Judge Douglas P. Woodlock for illegal refusal to take calls at lunch) (copy attached); Otis Elevator Co. v. IUEC Local 4, No. 04-12493-RGS (Standstill Order by Judge Stearns against Local 4); Otis Elevator Co. v. IUEC Local 4, No 04-10916-JLT (order to Arbitrate and Restraining Order issued by Judge Stearns over Local 4's refusal to install elevator doors).

Local 4's responsibility for the sickout is equally clear. A union is responsible for an unlawful sickout where there is: (1) some indication of union activity or pursuit of union goals,

followed by or coincident with; (2) an unusual pattern of absenteeism; and (3) either the union orchestrated the events or the union failed to disavow the conduct and failed to urge its members back to work. Laborers' Local 616 (Bruce & Merrilees), 302 N.L.R.B. 841 (1991). See also Olin Corp., 268 N.L.R.B. 573 (1984) (Union responsible for sickout of 43 employees); National Steel & Shipbuilding Co., 324 N.L.R.B. 499 (1997); Nabisco, Inc., 267 N.L.R.B. 1236 (1983).

The Board's decision in Bruce & Merrilees is particularly instructive because the Board reasoned as follows:

> ... 16 employees, 10 teamsters and 6 laborers, suddenly claimed illness at the same time and on the same day that two of their representatives engaged in conduct aimed at acquiring a portion of the disputed work. These circumstances provide a reasonable basis for inferring that what was involved was a work stoppage in the guise of a sickout. We also find that the Laborers and Teamsters must bear responsibility for the walkout because their representatives took no steps to disavow their members' conduct or to try to get them to go back to work.

302 N.L.R.B. at 843.

Applying these principles, Local 4's legal responsibility for the sickout is clear.

    3.    **The Strike Is Over A Dispute That The Union And Otis Are Required To Arbitrate**

The parties are bound by the Otis Agreement to arbitrate the underlying dispute. Article XV contains comprehensive arbitration procedures for the settlement of "<u>any difference or dispute regarding the application and construction of the Agreement</u>" (emphasis added). The current dispute concerning the discipline of Mechanics is a "difference or dispute regarding the application and construction" of Article IV of the Agreement and, thus, subject to the mandatory grievance and arbitration procedures contained in Article XV.

    4.    **The Fourth Requirement Of Boys Markets, The Justification Of Injunctive Relief On The Basis Of Ordinary Principles Of Equity, Is Also Met**

In Boys Markets, the Court cautioned lower courts not to grant injunctive relief unless the alleged contract breach has "caused or will cause irreparable injury to the employer; and . . . the employer will suffer more from the denial of an injunction than will the union from its issuance." Boys Markets, 398 U.S. at 235. Otis plainly meets this threshold.

A variety of factors have been held to constitute irreparable harm for purposes of a Boys Markets injunction. Where, as here, a work stoppage prevents an employer from performing contracts by required completion dates, the employer suffers irreparable harm. Elevator Mfrs. Ass'n v. International Union of Elevator Constructors, 342 F. Supp. 372, 373 (S.D.N.Y. 1972). Findings of irreparable harm have also been made where the unlawful strike has caused operations to be shut down or production to be interrupted. See Otis Elevator Co. v. Local 1, IUEC, 684 F. Supp. 80, 80-82 (S.D.N.Y. 1988)("work stoppages are likely to damage plaintiff's business irreparably," including "lost goodwill" and "permanent loss of business"); Elevator Mfrs .Ass'n of New York v. Loc. 1, IUEC, 689 F.2d 382, 386 (2d Cir. 1982). Findings of irreparable harm have also been made where the unlawful strike has caused operations to be shut down or production interrupted. See Gallagher Asphalt Corp. v. International Union of Operating Eng'rs, Local 150, 967 F. Supp. 333, 337 (N.D. Ill. 1997) (irreparable injury found where work stoppage brought construction project to a halt); U.S. Steel Corp. v. United Mine Workers, 534 F.2d 1063, 1979 (3d Cir. 1976); Hilton Int'l Co. v. Asociacion De Empleados De Casino De Puerto Rico, 324 F. Supp. 492, 494 (D.P.R. 1971).

Similarly, where, as here, a work stoppage prevents employers from performing contracts, the resulting loss of business and consequent damage to the employer's reputation has been held to constitute irreparable harm. National Elevator Indus. Inc. v. IUEC, 776 F.2d 374, 378 (1st Cir. 1985) (irreparable harm shown where work stoppage resulted in damage to

reputation); Gallagher Asphalt Corp., 967 F. Supp. at 337 (irreparable harm where work stoppage is likely to continue at great economic harm to employer); Airborne Freight Corp. v. International Bhd. of Teamsters, Local 705, 216 F. Supp. 2d 712 (N.D. Ill. 2002) (irreparable injury could be shown by loss of reputation and good will caused by the work stoppage); Elevator Mfrs. Ass'n, 342 F. Supp. at 373 (injunction issued when employer alleged that work stoppage will prevent performance of contracts by required completion dates); Ciba-Geigy Corp. v. Local No. 2548, United Textile Workers of America, AFL-CIO, 391 F. Supp. 287, 293 (D.R.I. 1975) (irreparable harm where work stoppage is likely to continue at great economic harm to employer); Educational and Recreational Servs., Inc. v. United Steelworkers of America, Local 8751, 1980 WL 2165 at *3 (D. Mass. October 29, 1980) (contractual liabilities for money damages for terminating underlying contract together with the difficultly of ascertaining damages amounted to irreparable harm).

Findings of irreparable harm also have been made where the work stoppage threatens public health, safety and welfare. Otis Elevator Co. v. Local 1, International Union of Elevator Constructors, 684 F. Supp. 80, 82 (S.D.N.Y. 1988). As the Court of Appeals for the Second Circuit observed in Elevator Mfrs. Assn. of New York:

> It is undisputed that the prompt servicing of elevators and escalators in emergency situations, particularly after normal working hours, is important to public safety, health and welfare. Such situations can occur, for instance, when buildings are threatened by fire or smoke, when persons in need of medical assistance are trapped in elevators that will not open, when adequate patient care or surgery is interrupted by an elevator failure, or when an elevator breakdown stops production in a plant.

689 F.2d at 383.

There could hardly be a more appropriate case for injunctive relief than the present matter. Otis is under contract to service elevators at numerous locations throughout Maine,

including apartment and condominium complexes, hotels and other buildings open to the general public, power plants, nursing homes and hospitals. If the work stoppage continues, Otis will be unable to respond in a timely manner to service calls at its customers' facilities. Despite the fact that Otis is contractually obligated to respond promptly to service calls at these and other locations where improperly functioning elevators can threaten public safety, health and welfare, members of the Union are refusing to perform service work. As a result of the Union's actions, Otis will be unable to respond in a timely and appropriate manner to emergency service calls at these facilities.

Thus, unless the relief sought herein is granted, substantial and irreparable injury to Otis, its customer, the public, and other third parties will follow.

In addition, the current work stoppage has caused and continues to cause irreparable damage to the Company's goodwill, reputation and commercial relationships within the industry. Otis has a contractual obligation to complete installation of elevators at four sites in Maine in a timely manner. Local 4's interference with Otis' operations is already threatening Otis' ability to timely complete construction work on at these job sites.

Thus, unless the relief sought herein is granted, substantial and irreparable injury to Otis, its customers, the property owners, and other third parties will follow. The unlawful work stoppage is preventing Otis from fulfilling its contractual obligations and threatening Otis's reputation and good will with customers

Finally, the balance of harms decidedly tips in Otis' favor. The Company has followed all of its contractual obligations in good faith and will suffer severe damage and loss of goodwill if this Court fails to grant the requested injunctive relief. Conversely, interim equitable relief in favor of the Company will cause the Union no injury whatsoever. The Union merely will be

"held to its agreement to arbitrate this dispute without recourse to a work stoppage." New York Times Co. v. NMDU, 592 F. Supp. 1043, 1051 (S.D.N.Y. 1984). The arbitrator can provide an appropriate remedy for any contractual violations. Clearly, "[t]he effect on the [U]nion if [injunctive relief] is granted is less onerous than the harm which [will] be suffered by the [Company] if the injunction is not granted." Boys Markets, 398 U.S. at 235; see also National Elevator Indus., 776 F.2d at 378 (neither the union nor individual defendants suffered harm as a result of the injunction).

Since all of the requirements for equitable relief have been satisfied in this case, this Court should enjoin the Defendants' activities. These activities violate the no-strike clause in the Otis Agreement, concern a grievance that the parties are bound to arbitrate and are causing irreparable harm to Otis.

## III. CONCLUSION

For all of the foregoing reasons, this Court should enjoin Defendants from violating the collective-bargaining agreement, order the parties to arbitrate pursuant to said Agreement, and order other relief as requested in the Complaint.

Respectfully submitted,

Dated at Boston, Massachusetts
June ___, 2005

MORGAN BROWN & JOY, LLP

By: _____
Nathan L. Kaitz
Laurence J. Donoghue
M. Amy Carlin
MORGAN, BROWN & JOY, LLP
200 State Street, 11th Floor
Boston, Massachusetts 02109
Telephone : (617) 523-6666
Fax : (617) 367-3125

DOWNS RACHLIN MARTIN PLLC

By: _____
Timothy E. Copeland Jr., Esq.
DOWNS RACHLIN MARTIN PLLC
80 Linden Street
PO Box 9
Brattleboro, VT  05302-00009
(802) 258-3070

ATTORNEYS FOR OTIS ELEVATOR COMPANY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OTIS ELEVATOR COMPANY )<br>Plaintiff; )<br>)<br>v. )<br>)<br>LOCAL 4, INTERNATIONAL UNION )<br>OF ELEVATOR CONSTRUCTORS; )<br>MICHAEL LANGER, INDIVIDUALLY, )<br>and as BUSINESS MANAGER; )<br>KEVIN McGETTIGAN, INDIVIDUALLY, )<br>and as BUSINESS REPRESENTATIVE; )<br>STEVE MORSE, INDIVIDUALLY, and )<br>as BUSINESS REPRESENTATIVE; )<br>and all others conspiring, acting in concert )<br>or otherwise participating with them or )<br>acting in their aid or behalf, )<br>)<br>Defendants. ) | Docket No.<br><br>05 11213 NMG<br><br>June 9, 2005 |

### ATTORNEY'S CERTIFICATE

Timothy E. Copeland Jr. hereby certifies as follows:

1.      I am an attorney with the firm Downs Rachlin Martin PLLC, attorneys for Plaintiff Otis Elevator Company. I make this certification pursuant to Fed. R. Civ. P. 65(b)(2) and in support of Plaintiff's Motion for Temporary Restraining Order.

2.      At approximately 9:30 a.m. on Thursday, June 9, 2005, I spoke with Paul Kelly of the law firm of Segal, Roitman & Coleman, whom I knew to be counsel to Defendant Local 4, International Union of Elevator Constructors ("Local 4"). Mr. Kelly and I were together in Boston, Massachusetts at an arbitration involving another matter. I told Mr. Kelly that Local 4 was engaged in an illegal work stoppage in Maine. Mr. Kelly told me he was familiar with the dispute. I spoke with Mr. Kelly several

additional times between 9:30 and 11:30 a.m. on June 9. Approximately 1:00 p.m., I spoke with Mr. Kelly via telephone and informed him that I was proceeding to seek an injunction this afternoon in Federal Court in Boston. Mr. Kelly told me he planned to be at Federal Court arguing a motion in another matter at 3:00 p.m.

3. I am not aware that any of the individual Defendants is represented by counsel other than Mr. Kelly.

4. I respectfully submit that no further notice should be required as Otis Elevator Company is sustaining irreparable injury through interference with its daily operations caused by Defendants' work stoppage, which is in effect at this time.

5. No prior application for the relief herein sought by Plaintiff or for similar relief has been made to any court or judge of the United States or of any state.

Dated at Brattleboro, Vermont  
June 9, 2005

Respectfully submitted,  
DOWNS RACHLIN MARTIN PLLC

By_____  
Timothy E. Copeland Jr.  
80 Linden Street  
PO Box 9  
Brattleboro, VT 05302  
802-258-3070

ATTORNEYS FOR PLAINTIFF  
OTIS ELEVATOR COMPANY

BRT.52622.1

2