UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OTIS ELEVATOR COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-11213NMG |
| | ) | |
| LOCAL 4, INTERNATIONAL UNION | ) | |
| OF ELEVATOR CONSTRUCTORS; | ) | |
| MICHAEL LANGER, INDIVIDUALLY, | ) | |
| and as BUSINESS MANAGER:  KEVIN | ) | |
| McGETTIGAN, INDIVIDUALLY, and | ) | |
| as BUSINESS REPRESENTATIVE; | ) | |
| STEVE MORSE, INDIVIDUALLY, and | ) | |
| as BUSINESS REPRESENTATIVE, and | ) | |
| all others conspiring, acting in concert or | ) | |
| otherwise participating with them or acting | ) | |
| in their aid or behalf, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR ATTORNEYS FEES

Plaintiff Otis Elevator Company ("Otis") opposes Defendants' Motion for Attorney Fees (the "Motion").  The Motion should be denied because 1) there was no improvidently-granted injunction; and 2) the Defendants did not suffer any "expense, loss or damage" caused by any order or injunction.  The Court should reject the Defendants' request to punish Otis for voluntarily dismissing this action after the Court's June 9, 2005 Temporary Restraining Order ended the Defendants' unlawful conduct.  Granting the Defendants' request would simply encourage prolonged litigation.  In support, Otis relies on the following memorandum of law.

## MEMORANDUM OF LAW

### I.    BACKGROUND AND PROCEDURAL HISTORY

Otis commenced this action via verified complaint for injunctive relief on June 9, 2005 following a work stoppage by every member of Defendant International Union of Elevator

Constructors ("IUEC") Local 4 ("Local 4")[1] working in the state of Maine.  The June 9 strike was only the most recent in a series of unlawful work stoppages by Local 4.  This Court enjoined strikes by Local 4 on May 19, 2004 (Case No. 04-10966-JLT (Stearns, J.)); on June 3, 2004 (Case No. 04-11108-JLT (Tauro, J.)); and on November 30, 2004 (Case No. 04-12493-RGS (Stearns, J.)).  In April 2004, Otis sought injunctive relief against a work stoppage by Local 4 members in Maine.  Otis Elevator Company v. Local 4, Int'l Union of Elevator Constructors et al, Docket No. CV 04-74 P-S (D. Me.  April 14, 2004) (transcript of chambers conference attached as Exhibit A).  The Court ruled that a temporary restraining order enjoining the work stoppage was moot based on Local 4's counsel's representations that the striking employees had returned to work and would not resume their strike. (Exh. A at pp. 13-14).  Local 4's recent history of strikes is summarized in the United States Court of Appeals for the First Circuit's May 11, 2005 decision in Otis Elevator Co. v. International Union of Elevator Constructors. Local 4, 408 F.3d 1 (1st Cir. 2005), in which the court, inter alia, affirmed that portion of the District Court's order enjoining Local 4 from striking Otis.

      A.     The Underlying Arbitrable Dispute and the Strike

Not even one month passed following the First Circuit's decision before Local 4 struck again.  This time, the strike had its roots in Otis Employee John Gorecki's resignation as a member of Local 4 in April 2005.  (Verified Complaint ("Complaint") at par. 18).  On or about April 29, 2005 in the evening, either during or shortly after Local 4 officials held a meeting in Maine, Mr. Gorecki began receiving harassing telephone calls at his home.  (Id. at 19).  In early May, an Otis Employee/Local 4 Member who made at least some of the calls was disciplined for the calls and for threatening to make his supervisor's and Mr. Gorecki's lives "miserable" if he

---

[1]      Unless otherwise indicated, this Memorandum will refer to Local 4 and the individual Defendants, all of whom are Local 4 agents, collectively as "Local 4."

was assigned to work with Employee Gorecki.  (Id. at 20).  Other Local 4 members said they did

not want to work with Gorecki.  (Id. at 21-22).  Otis attempted to hire Apprentice Burpee from

Local 4's bench to work with Employee Gorecki, but after initially accepting the assignment

Apprentice Burpee failed to report as directed, saying he had to decline the assignment because

he was directed by a Local 4 official that if assigned to work with Employee Gorecki he should

"think about it."  (Id. at 23).

      On June 6, 2005, incumbent Otis Employee/Local 4 Member Eric Smith refused a

direction to work with Employee Gorecki citing a promise he had made to his Local 4 brothers

and sisters.  (Id. at 24).  Otis issued written discipline to employee Smith.  (Id. at 24).  After

initially stating he was quitting, Employee Smith said he needed to check with Local 4.

(Declaration of Richard Hogue ("Hogue Dec.") at par. 6-7).  He then said, "I refuse to work with

John [Gorecki], but I don't quit."  (Id. at 7).  On June 7, Otis employees in Maine began refusing

to work protesting that employee Smith had been disciplined for refusing to work with employee

Gorecki.  (Complaint at par. 26-27).  One employee told his supervisor that if employee Smith

was not hired back,[2] "word is we're going on strike tomorrow."  (Id. at par. 26).  On June 8, all

Local 4 members from Otis' Portland, Maine office appeared at the office rather than their

assigned work sites, then left and began calling their supervisors to say they would not work.

(Id. at par. 27).  Some claimed they were sick; others said they would not return until "this is

resolved."  (Id.)  At Otis' Bangor office, employees initially went to work but about one-half

hour later began calling to claim they were "sick."  (Id. at 28).  By mid-morning on June 8, every

Local 4 member employed by Otis in Maine was on strike.  (Id. at 29).

---

   [2]      The employee's use of the phrase "hired back" suggests he was misled to think his union brother had been
discharged.

Otis made several attempts to resolve the dispute with Local 4.  Local 4 Business

Manager Michael Langer told Otis Regional Field Operations Manager ("RFOM") Christensen

that he would make some calls and get back to him.  (Id. at 30).  Later, Business Manager Langer

confirmed he had spoken with Local 4 members.  (Id. at 31).  He did not state they would work,

but said they would go to Otis' Portland office to meet with RFOM Christensen.  (Id.)  However,

the employees failed to report to work again on June 9 and did not report to meet with RFOM

Christensen.  (Id. at 32).  On June 9, 2005, Local 4 Business Manager Langer told Otis Manager

of Labor Relations Powilatis that if Otis made Gorecki work alone for one month, "I think that

will get some guys to return to work."  (Id. at 35).  Local 4 Business Manager Langer then said

he would end the work stoppage if Otis rescinded the disciplinary letter issued to Employee

Smith for refusing to work with Employee Gorecki.  (Declaration of David Powilatis ("Powilatis

Dec.") at par. 7).  Manager of Labor Relations Powilatis replied that if Local 4 ended its strike,

including refusing to work with Employee Gorecki, Otis would rescind the Smith disciplinary

letter.  (Id.)  Local 4 Business Manager Langer refused, and the strike continued.  The strike

brought Otis' elevator and escalator construction and service operations in Maine to a complete

halt.  (Complaint at par. 38-40, 47-50).  As a result, Otis' service personnel were not in position

to respond to emergency service calls as required under Otis' service contracts with customers.

(Complaint at par. 37-40).  This action ensued.

       B.     The Emergency Hearing on June 9, 2005

Following notice to the Defendants and service of the Complaint and other papers filed

by Otis, the Court held an emergency hearing on Otis' Motion for Temporary Restraining Order

late in the day on June 9, 2005.  By then, a malfunctioning elevator in Maine had entrapped a

passenger (an "entrapment").  (Transcript of June 9, 2005 Emergency Hearing (Exh. B) at 18-

19).  An Otis employee should have been no more than a few minutes away from the entrapment

but was not because he was on strike. (Id.) Otis was delayed in responding to the entrapment as three Otis supervisors were trying to cover all service operations in Maine. (Id.)

Local 4 appeared at the hearing and did not dispute most of the predicates for injunctive relief, including that all Local 4 members in Maine were on strike over a dispute arbitrable under the Otis/IUEC collective-bargaining agreement (the "Otis Agreement"). However, Local 4 denied responsibility for the strike. Local 4 did not dispute any of Otis' evidence that Local 4 officials had been in constant telephone contact with striking Local 4 members.[3] Rather, Local 4 represented that it had sent a written "directive up to Maine that everybody should get back to work." (Id. at 4-5). In response to a question from the Court, Local 4 again represented that the written directive had been issued to all Local 4 members employed by Otis in Maine. (Id. at 5). Later, Local 4 argued that a Court order directing it to order employees back to work was unwarranted because "We've already done that." (Id. at 8). Later, Local 4's representative claimed, "The local has called them and said look at – we've written them and said you don't have any right to do this." (Id. at 9). Notwithstanding these repeated representations, Local 4 offered no dispute later to evidence that when Otis inquired about how the letter had been transmitted to any Local 4 member, the answer was that on Thursday, June 9, 2005, Local 4 had sent the letter to employees via U.S. Mail. (Powilatis Dec. at 6). Not surprisingly, Local 4 offered no evidence that any employee had actually received the letter as of the hearing. Otis checked on June 9 with two striking Local 4 members who said they had not heard of the letter and would not go back to work. (Exh. B at 16).

---

[3]    To the contrary, Local 4 confirmed that its officials had been in contact with Local 4 members in Maine and New Hampshire. (Exh. B at 6-7). Local 4's representations about the content of those conversations are revealing. Local 4 said it told New Hampshire employees not to strike, (Id. at 7), and employees in New Hampshire did not strike. Local 4 did not make a similar representation about its conversations with members in Maine. (Id. at 6). Clearly, if Local 4 had told members in Maine not to strike, it would have represented as much to the Court.

C.    The TRO is Issued, Ending the Strike

At the conclusion of the emergency hearing on June 9 the Court entered a Temporary Restraining Order restraining Local 4 from, inter alia, calling, causing or inducing any strike or other interference with Otis' operations (the "TRO"). The TRO directed Local 4 to "take all reasonable means to communicate and effectuate the provisions of the [TRO], including but not limited to the holding of meetings with employees represented by Defendant Local 4 . . ." The striking employees returned to work the very next day.[4] Employees worked as directed without interruption for the ensuing ten days, and on June 21 Otis advised the Court that following consultation with Local 4 it would not proceed with a request to convert the TRO into a preliminary injunction. The TRO expired on June 23. After Otis experienced no further interruptions in Local 4's jurisdiction over the ensuing twelve days, this action was voluntarily dismissed on July 5, 2005.

## II.    ARGUMENT

A.    The TRO was Proper

The premise for Local 4's motion appears to be a contention that it was not legally responsible for the strike. Although Local 4 does not identify any damage arising from the issuance of the TRO, it seeks recovery of its attorneys fees expended in defending the TRO and in preparing an opposition to the motion for preliminary injunction.

Local 4's claim that the TRO was improvidently granted is without merit. The Court was presented with more than ample evidence to support a temporary restraining order pursuant to Boys Markets v. Retail Clerks Union, 398 U.S. 235 (1970) (to obtain injunctive relief against a work stoppage, a moving party must show 1) the existence of a collective-bargaining agreement

---

[4]    If the Court concludes a hearing is warranted in this matter, Otis will be prepared with evidence with respect to events occurring after the TRO was issued.

containing a binding grievance and arbitration provision; 2) a breach of a no–strike obligation; 3) over a dispute the parties are required to arbitrate; and 4) that injunctive relief is justified under ordinary principles of equity).  At the June 9 hearing the following were undisputed and/or conceded:

- Local 4 is bound by a collective-bargaining agreement between Otis and the IUEC containing a binding grievance and arbitration provision and a no-strike clause.  (Exh. A to Complaint);

- The underlying dispute arose because an Otis employee had exercised his right to resign from Union membership, and Local 4 members wanted to refuse to work with him without consequence.  (Exh. B at 9);

- The strike erupted after Otis disciplined a Local 4 member for refusing to work with the former Local 4 member.  (Id. at 9 & 21);

- ". . . [T]he discipline of an employee is an arbitrable dispute."  (Id. at 21);

- Every Local 4 member employed by Otis in Maine participated in the work stoppage.  (Id. at 6-8);

- As a result of the strike, elevator construction work at three important and time-sensitive projects was halted, threatening Otis' relationship with three customers.  (Complaint at par. 49-50);

- As a result of the strike, Otis was impaired in responding to service calls reporting malfunctioning elevators.  (Complaint at par. 50-51).  On June 9, Otis was delayed in responding to an entrapment.  (Exh. B at 18-19).

As Local 4 concedes in its Motion, it staked its entire defense at the June 9 hearing on a claim that it was not responsible for the strike.  (Motion at 3).  However, the evidence was more than sufficient to permit the court to conclude that Local 4 was in complete control of whether its members worked or not.  Local 4 Business Manager Langer admitted he was in contact with employees in Maine.  At the hearing, Local 4 represented it had ordered its members in New Hampshire not to participate in the strike but made no such representation about its conversations with Maine employees.  Just prior to Otis petitioning the Court for injunctive relief, Local 4 said

it would end the strike if Otis would make Employee Gorecki work alone for one month.[5]  Local 4 declined to end the strike when Otis said employees should be expected to work with Employee Gorecki if directed.

The only "evidence" Local 4 offered at the hearing was the letter addressed to "all IUEC Members Currently Employed By Otis Elevator Company."  Local 4 claimed to have already delivered the letter to all Local 4 members in Maine.  No fewer than four times during the hearing.  (Exh. B at 4-9).  Local 4 implied that a court order directing Local 4 to order employees back to work would be futile because by sending the letter Local 4 had "already done that."  (Id. at 8).  However, the evidence later revealed that at best, Local 4 had placed the letter in the U.S. mail.  (Powilatis Dec. at 6).  It is reasonable to assume that a letter ordering employees to return to work and placed in the mail on Thursday, June 9 would not reach its destination until Monday, June 13.  Absent any other directive, such a tactic would ensure that striking employees would remain on strike for four days.  Local 4 did not explain why it chose mail delivery for a letter purporting to disavow the strike when it admittedly was in constant telephone contact with Local 4 members in Maine.  Had Local 4 wanted to, it could have called Local 4 members, read them the contents of the letter and reported as much to the Court.  The explanation for why it did not is simple:  Local 4 sanctioned the strike.  It wanted to create an impression that it was trying to end the strike while avoiding any meaningful action to do so.  The only reasonable inference is that Local 4 was trying to mislead Otis and the Court about its actual responsibility for the strike.

Local 4 also argues that several unsigned "affidavits" it procured after the June 9 hearing "supports the Union's position under 29 U.S.C. § 107 that the [TRO] was improvidently

---

[5]      It should go without saying that even if Otis had any obligation to provide a concession to induce Local 4 to stop breaching the no-strike clause, if Otis had agreed to Local 4's suggestion of ostracizing an employee on the basis of his decision to refrain from union membership, both would have committed unfair labor practices.  29 U.S.C. § 157, 158(a)(3) and 158(b)(1)(A).

granted."  (Motion at 3).  Local 4's position is illogical as a matter of law, because "affidavits"

procured on or about June 20 necessarily offer no insight into the propriety of the TRO on June

9.  Moreover, the content of the "affidavits," purportedly by ten of the 16 strikers, fail to live up

to Local 4's billing.  To the contrary, they support Otis' claim for injunctive relief.  Employee

Smith, whose discipline triggered the strike, candidly admitted that he decided he was

uncomfortable working with employee Gorecki at a Union meeting at which employee Gorecki's

resignation was discussed.  There, employee Smith vowed he would not work with employee

Gorecki.  Several affidavits claimed that employees felt "ripped off" or taken advantage of by

employee Gorecki for accepting the benefits of union membership without "carrying his own

share of the dues."  Although two employees claimed they were really sick on June 9, every

"affiant" said he struck because he felt an obligation to support his "union brother."  Perhaps

most revealing, with one vaguely-worded exception,[6] none of the affidavits claimed that the

affiant ever received Local 4's "letter" disavowing the strike, even though the "affidavits" of all

dated June 20, eleven days after Local 4 allegedly sent the letter.

Even if one were to evaluate the propriety of the TRO in light of evidence Local 4

procured later, it would not change the conclusion that the TRO was properly issued.  Unlike

prior Local 4 work stoppages that found their way to this Court, very little was left in dispute

when the parties appeared on June 9, 2005.  The Court saw through Local 4's claims that an

order against it would be futile, and correctly concluded that Local 4 was responsible for the

strike and could be expected to end it.  That is exactly what happened within hours of issuing the

TRO.

---

[6]     The unsigned June 20, 2005 "Affidavit of John Dondero" claims that he received a letter from Business
Manager Langer directing him to return to work, but does not further identify the letter or state when he received it.

B.      The Defendants Are Not Entitled to Recover Attorneys' Fees

Citing a decision from the Ninth Circuit Court of Appeals, Local 4 argues that it should

recover attorneys' fees because it was "put to the expense of defense."[7]  Local 4 claims that

"Plaintiff caused Defendants to go to the time and expense of defending the request for a

preliminary injunction."  (Memorandum in Support of Motion at 4).  Local 4 further argues that

even though it did not have to appear at a preliminary injunction hearing and the case was

subsequently dismissed, "the net effect is the same as if Plaintiff's injunction had been denied."

Even if the latter proposition were true, Local 4's request for attorney fees should be denied.

The very decision Local 4 cited explains why.  In J.A. Jones Const. Co. v. Plumbers and

Pipefitters Local 598, 568 F.2d 1292 (9th Cir. 1978), the Plaintiff-employer obtained a temporary

restraining order enjoining a work stoppage, then moved for voluntary dismissal seven days

later.  The defendant-unions moved for recovery of costs and fees under an injunction bond.  (Id.

at 1293).  The district court denied the unions' motion.  (Id.)  On appeal, the Ninth Circuit Court

of Appeals held that the district court had failed to consider the impact of an intervening United

States Supreme Court decision pursuant to which the employer was never entitled to a restraining

order against one union because the employer did not have a collective-bargaining agreement

with that union – a clear prerequisite to injunctive relief under Boys Markets and Buffalo Forge

Co. v. United Steelworkers of America, 428 U.S. 397 (1976).  J.A. Jones Const. Co., 568 F.2d at

1295.  The court's holding in J.A. Jones Const. Co. clearly offers no support to Local 4.  It is

undisputed that Otis and Local 4 are bound by a collective-bargaining agreement that committed

---

[7]      The Motion claims recovery of attorneys' fees incurred on June 9 defending the TRO hearing and during
the week of June 13 to June 20 "in preparation for the preliminary injunction hearing."  It is not clear whether the
fees claimed by Local 4 include fees incurred in preparing a motion to transfer.

Local 4 to resolve disputes thereunder pursuant to the Agreement's grievance and arbitration procedure, not by striking.

The remainder of the holding in J.A. Jones Const. Co. supports Otis.  The unions also argued that they should be awarded damages arising from the injunction because the employer's motion for voluntary dismissal of its complaint was an admission "that the restraining order was erroneously or improvidently issued."  (Id. at 1294).  The court rejected that argument, explaining that voluntary dismissal:

> is not a confession that the restraining order was erroneously or improvidently issued.  The restraining order may have rendered further injunctive relief unnecessary and the issue moot, as the district court found here.  A contrary rule would have the undesirable effect of prolonging expensive litigation which serves no useful purpose.

(Id.)  See also Celotex Corp v. Oil, Chem. And Atomic Workers Int'l Union, 516 F.2d 242, 246 & 249 (3rd Cir. 1975) (reversing district court order granting enjoined union attorneys fees, inter alia, because employer's motion for permanent injunction was denied as moot because employees had returned to work).  That holding applies here.  Notwithstanding Local 4's claims at the TRO hearing that a TRO would be futile because it had no control over the strike, the TRO brought the strike to a swift halt.  Employees returned to work the very next day and remained at work without further interruption through June 21, when Otis informed the Court that following consultation with Local 4, it elected not to proceed with the preliminary injunction hearing.  Nearly two weeks after the TRO expired and with no indication that the work stoppage would resume, Otis filed its Notice of Dismissal.  Thus, as the court in J.A. Jones Const. Co. recognized was often the case with respect to injunctions against strikes, the TRO effectively ended the strike and therefore, Otis determined that under the circumstances, further proceedings were not necessary to ensure the continued end of the strike.  The Court should reject Local 4's plea to construe Otis' decision not to proceed with a preliminary injunction hearing as somehow

entitling Local 4 to recover fees as though it were wrongfully enjoined.  Accepting Local 4's

argument would only force litigants to unnecessarily protract injunction proceedings.  A party in

Otis' position could avoid responsibility for attorneys' fees only by consuming more of the

Court's and the parties' time and expense in dragging out an action for injunctive relief against a

strike that was effectively ended by the Court's initial ruling.  As the Supreme Court recognized

in <u>Boys Markets</u>, the purpose of an injunction enforcing a no-strike clause is to preserve the

status quo that existed prior to the work stoppage and aid the arbitration process.  That is exactly

what the Court accomplished on June 9.  The interests of judicial economy and voluntary

resolution of labor disputes would be ill-served by granting Local 4's request.

## III.    <u>CONCLUSION</u>

Local 4 has failed to produce any law or facts supporting a conclusion that the June 9

TRO was improvidently granted or that it should recovery attorneys' fees for any other reason.

To the contrary, events since June 9 have simply confirmed that Local 4 was in complete control

of when the strike started and ended.  Accordingly, the Motion should be denied.  Alternatively,

in the event the Court believes that consideration of the Motion requires evaluation of facts

procured after the June 9 emergency hearing, Otis requests an evidentiary hearing.

Respectfully submitted,

Dated at Boston, Massachusetts                    DOWNS RACHLIN MARTIN PLLC
November 9, 2005


By____/s/ Timothy E. Copeland_____
      Timothy E. Copeland Jr., Esq.
      80 Linden Street
      Brattleboro, Vermont 05301
      (802) 258-3070
      tcopeland@drm.com

      MORGAN, BROWN & JOY LLP



By_/s/ Nathan L. Kaitz_____
      Nathan L. Kaitz (BBO #256760)
      200 State Street, 11th Floor
      Boston, MA  02109
      (617) 523-6666
      nkaitz@morganbrown.com

      ATTORNEYS FOR PLAINTIFF
      OTIS ELEVATOR COMPANY


**CERTIFICATE OF SERVICE**

    I, Nathan L. Kaitz, hereby certify that I have on this 9th day of November, 2005 served the within pleading, by first class mail upon:  Paul Kelly, Esquire, Segal, Roitman & Coleman, 11 Beacon Street, Boston, MA  02108.


            _____/s/ Nathan L. Kaitz_____
                  Nathan L. Kaitz



BRT.59080.1

**EXHIBIT A**

1

1

2                    UNITED STATES DISTRICT COURT

3                       DISTRICT OF MAINE

4

5

6
OTIS ELEVATOR COMPANY,                CIVIL ACTION
7
        Plaintiff                Docket No.CV 04-74 P-S
8    v
LOCAL 4,
9    INTERNATIONAL UNION OF
ELEVATOR CONSTRUCTORS, et al
10                Defendant

11

12            Transcript of Proceedings
Transcript of conference in chambers and conference call
13   before HON. GEORGE Z.SINGAL, in the United States
District Court, Edward T. Gignoux Courthouse, Portland,
14   Maine, on the 14th day of April 2004 as follows:

15

16   Appearances:
        For the Plaintiff:      Timothy Copeland, Esq.
17                               Peter Bennett, Esq.

18
        For the Defendants:     Robert Matisoff, Esq.
19                               Paul Kelly, Esq.

20
                    Pauline D. Terry,
21              Official Court Reporter

22

23   Transcript recorded by mechanical stenography,
transcript produced by computer aided transcript.
24

25

```
 1              THE COURT:  All right, we're all here.

 2   We're here in the matter of Otis Elevator versus

 3   Internalal Union of Elevator Constructors, et al, we are

 4   here in my chambers for a conference with regard to a

 5   request for a temporary restraining order which has been

 6   filed by the plaintiffs. Counsel is present.  Starting

 7   with counsel for plaintiff, would you indicate who you

 8   are and where you're from.

 9              MR. BENNETT:  Peter Bennett of the Benneett

10   Law Firm in Portland.

11              MR. COPELAND: And I'm Tim Copeland of

12   Brattleboro, Vermont.

13              MR. BENNETT:  And the client.

14              THE COURT:  And the client?

15              DAVE:  Dave-- Labor Relations Manager from

16   Otis Elevator Company.

17              THE COURT: For the defendant?

18              MR. YOUNG:  Good morning, your Honor.  Jeff

19   Young from McTeague Higbee.  I have just learned about

20   this action about a half hour ago.  I'm here for the

21   International Union, local counsel.

22              THE COURT:  You don't want me to ask you too

23   many questions.

24              MR. YOUNG:  You can ask me questios but I'll

25   defer to Mr. Matisoff in all likelihood.
```

```
 1              THE COURT:  All right, who is on the phone?
 2              MR MATISOFF:  Your Honor, this is Bob
 3    Matisoff, I'm counsel for the International.  Winnie
 4    Gower of our firm is also here, and with Mr. Young we
 5    are counsel for the International as well as for
 6    individual defendant Ron Corbell who is one of the
 7    International's Regional Director.
 8              THE COURT: And who reperesents for the Local
 9    people?
10              MR. KELLY:  Your Honor, I represent--
11              THE COURT:  I can't hear you.
12              MR. KELLY:  My name is Paul Kelly.
13              THE COURT:  Mr. Kelly, I'm having trouble
14    hearing you.
15              MR. MATISOFF: Do you want me to see if I can
16    bring Mr. Kelly on a land line? Would that be acceptable
17    to you?
18              THE COURT: Fine.
19              Is everybody on a good line?
20              MR. MATISOFF: Okay. I think we're all here.
21              THE COURT: Let me hear from the plaintiff.
22    Tell me what this is all about.  Who is speaking?
23              MR. COPELAND: Tim Copeland for Otis Elevator
24    Company.  Your Honor, we have a problem, we have three
25    job sites - two in Maine and one in New Hampshire at
```

4

1   which Otis is attempting to install elevators for

2   important customers, and yesterday we learned that the

3   employees at those sites, who are represented by the

4   International Union of Elevator Constructors, through

5   its local, in this case Local 4, which represents

6   employees in Maine, New Hampshire and the Boston areas,

7   had instructed employees to refuse assignments to

8   proceed with elevator construction at those three sites.

9           Apparently the Union, there is a dispute as

10  to the proper procedure for overhead protection for

11  employees working in the hoist ways.  And we are not

12  entirely sure that we understand the Union's position.

13          THE COURT:  They want plywood barriers,

14  don't they?

15          MR. COPELAND: That would appear to be the

16  case.  It has sort of evolved as this dispute has

17  developed. But were a series of discussions between the

18  parties and earlier this week, I think when Otis felt

19  that it was not making any headway in getting the union

20  to see its position, they arranged for a conference call

21  with an OSHA individual who described what OSHA expects.

22  During that call the Otis safety official described the

23  process that Otis used, and described how it exceeded

24  what OSHA required.  And a representative of Local 4,

25  Mr. Langer, I understand was on this call.

5

1        Not withstanding the impression that Otis

2   took away from the meeting, which is that it put the

3   issue to bed, the Union apparently decided to instruct

4   employees to refuse to proceed and takes the position

5   that in any hoist way of more than 4 stops, which means

6   that there are more than four landings at which the

7   elevator stops, notwithstanding what this OSHA official

8   describes it as an adequate safety mechanism, there

9   needed to be a solid plywood canopy, I guess, for lack

10  of a better word, over the car in which the employees

11  would be working.  And apparently it has been telling

12  employees since then that Otis agreed with the Union

13  that that would be the case going forward, which is not

14  the case at all.

15       Otis has a very clear procedure as to what

16  safety measures it implements at elevator installation

17  sites and although an overhead plywood canopy is one of

18  the methods, it is not a required method and it isn't

19  required on the three jobs in Maine - two jobs in Maine

20  and one in New Hampshire - that were the subject of this

21  refusal yesterday.

22       So we have an interruption at work.  We have

23  what we think is an extremely dire situation,

24  particularly with one of them, that is, the installation

25  at Bowdoin College where the general contractor, which

6

1    is the party with whom Otis has the contract, is saying

2    to Otis, we need that elevator now.

3            And there is a reason for that. The

4    construction site at which this elevator is being

5    installed is a new construction site at which there are

6    other aspects of construction being performed and they

7    need to be performed in stages.  So, for example,

8    sheetrock around elevator entrances can't be completed

9    until the elevator entrances have been installed.

10           So there is a high amount of coordination

11   that needs to happen in order for the entire project to

12   move forward to its completion deadline.  So when Otis

13   experiences a delay in completing its aspect of the

14   construction at the site, any of its aspects, not just

15   the final completion date but interim completion dates

16   for completing different aspects of the job, it has sort

17   of a domino effect through the rest of the installation.

18   And the general contractor apparently is already

19   concerned that a delay on Otis' part is going to have an

20   overall effect on the entire job.

21           And it has told Otis that it has liquidated

22   damages in its contract with the owner of the facility,

23   and that if it suffers a liquidated damages penalty, it

24   will be looking to Otis for recovery of that.

25           THE COURT: What does the union say in regard

7

1   to this?  Who is going to address this?

2           MR. KELLY: Can you hear me now?  Your Honor,

3   this is Paul Kelly from Boston.

4           THE COURT: Speak right up.

5           MR. KELLY: Let me first of all say this.  I

6   have not seen any papers.  I don't know a lot about this

7   dispute although I did have discussion yesterday with

8   both my client and with the attorneys for Otis.

9           I understand the dispute to be pretty much

10  what Tim Copeland just described.  I think the

11  misunderstanding was that in the conference with the

12  OSHA inspector, Local 4 understood from Otis' safety man

13  that overhead protection would be supplied on four

14  stories and above. And later on that changed. Now, that

15  was was my client's understanding of that discussion.

16          When that changed later on, on the projects

17  that were more than four stories, I think it is true

18  that the workers refused to work inside the hoist way

19  without that protection.

20          Subsequently the lawyers called, we talked

21  about it. Yesterday, as I understand it, the men went

22  back to work in the hoist ways without that protection.

23  As a consequence I said, well, that dispute is over, and

24  we're not going to have a hearing in Federal Court.  I

25  understand we do now.  I don't think there is a

1   situation that warrants a TRO because I don't think that

2   whatever, you know, whatever dangers or damages the

3   company is describing are being incurred.

4           THE COURT:  You are telling me, Mr. Kelly,

5   that the union workers are back at work?

6           MR. KELLY: And have been since yesterday

7   afternoon.

8           THE COURT: And will continue to be?

9           MR. KELLY: Yes.

10          THE COURT: If there is a grievance with

11  regard to this issue it will be handled under the

12  contract?

13          MR. KELLY: Yes.

14          THE COURT: So there is no risk of work not

15  being done, is that what you're saying?

16          MR. KELLY: Yes.  And that was the same

17  message I gave to the company yesterday.

18          THE COURT: Are you authorized to make that

19  representation?

20          MR. KELLY: Am I authorized to make it?

21          THE COURT: Yes.

22          MR. KELLY: Yes.

23          THE COURT: Anything else you want to tell

24  me?

25          MR. KELLY: If there is anything that is

9

```
 1   going to happen, your Honor, I would like an opportunity
 2   to review the papers on which my clients, and there is
 3   some indication that this is more than just Local 4. I
 4   don't know who is being sued.  I'm not sure what the
 5   allegations are.  And I think in the absence of a work
 6   stoppage that we ought to have a hearing.  We ought to
 7   have notice. I'm just-- I'm concerned that I'm in a
 8   severe disadvantage in this proceeding.
 9           THE COURT:  Unfortunately you got more
10   notice than some lawyers get on a TRO. I understand what
11   you're saying.
12           Let me reflect my understanding. Otis had
13   some problem with regard to people working in these
14   hoist ways.  Otis says this is an issue that should be
15   subject to the grievance procedure under the contract.
16           The Union has responded,  saying, yes we had
17   a problem but that problem is now resolved.  And, as we
18   speak here today everybody is back at work and,
19   therefore, the issue is moot.  There is no need for an
20   injunction.
21           It seems to me that if in fact everyone is
22   back at work, this Court should not be issuing an
23   injunction.  I'm willing to listen.
24           MR. MATISOFF: This is Mr. Matisoff on behalf
25   of the International.  I wholeheartedly agree and I
```

10

1    would further note that with respect to any claim for

2    injunction against the International, there is

3    absolutely no basis for that whatsoever.

4            The Maine case that the plaintiff cite in

5    their papers, and the whole market issue from the First

6    Circuit is a case I know quite well, having been the one

7    to argue before the First Circuit successfully, that

8    there is no basis for enjoining the International in one

9    of these disputes, in the absence of evidence that the

10   International took some action to ratify or participate

11   in the alleged work stoppage, which is sorely lacking in

12   this case.

13           So, not only would I argue that there is no

14   basis whatever for any extraordinary remedy of a TRO,

15   but certainly no basis for the kind of sweeping

16   nationwide injunctive order that the plaintiff has

17   proffered to the Court in this instance.

18           THE COURT:  You are arguing that even if I

19   enjoin the Local, you don't want any part of it?

20           MR. MATISOFF: That is absolutely correct,

21   your Honor.

22           THE COURT: I see.  Okay. Let me hear from

23   the Employer.  Isn't it pretty clear that we can

24   determine quite easily whether people are back to work

25   or not?

1          MR. COPELAND: Yes.  And for the moment it

2     does appear to be the case.

3               I guess the only part of your Honor's

4     summary that I have a concern about is a conclusion that

5     the problem is resolved.

6               In fact, I took exactly the opposite

7     inference from what Mr. Kelly said, and that is that the

8     Union appears to still be laboring under the

9     understanding that Otis has agreed that on any elevator

10    of more than four stops that Otis has committed itself

11    to providing this overhead barrier.  That is not at all

12    the case and not at all what we think was the upshod of

13    the conference with OSHA yesterday.

14          THE COURT: Let me just iterrupt. Mr. Kelly,

15    is it your position that if there is a dispute between

16    the Union and Otis with regard to what they have to do

17    with regard to protection and four more stops, that is

18    an issue that's properly grieveable under the terms of

19    the contract?

20          MR. KELLY: I think that is accurate.

21          THE COURT: Is that the company's position

22    also?

23          MR. COPELAND: Yes.

24          THE COURT:  Am I correct, from both sides,

25    that if the parties continue to argue about that issue,

1    that is an issue that the parties will go to grievance

2    with regard to, Mr. Kelly?

3              MR. KELLY: I'm not aware that there is a

4    grievance filed, right now. I just don't know.

5              THE COURT: I know, but is this properly

6    subject to a grievance procedure under the contract?

7              MR. KELLY: I would agree that it is subject

8    to the grievance procedure under the contract.

9              THE COURT: And the company agrees with that?

10             MR. COPELAND: We do your Honor, but that

11   begs the question of why we're here.  Why have they not

12   filed a grievance already?

13             THE COURT:  Why haven't you not filed a

14   grievance, since it is properly grievable by both sides?

15   If people don't show up at work, can't you grieve  under

16   the contract?

17             MR. MATISOFF: Yes, the company routinely

18   files grievances against local unions as well as the

19   International in some cases.  And they have the right to

20   do, and to seek damages through the grievance

21   procedures.

22             THE COURT:  Go ahead. There is a lot of

23   money being spent here for lawyers.

24             The issue here is whether or not they are

25   back at work, as far as I'm concerned.  If they are back

13

1    at work, the company is happy.  But they don't want them

2    to work for one day and tomorrow they're out of work

3    again.  That is the risk.  And Mr. Kelly is telling me

4    that is not going to happen.  Correct, Mr. Kelly?

5              MR. KELLY: It's not going to,  your Honor,

6    and it is certainly not going to happen as far as this

7    dispute.

8              THE COURT:  I will let you talk, Mr.

9    Bennett, in a minute.

10              As far as this dispute is concerned, the

11    people are back at work and they are not going to not

12    work because of this dispute.  And if they still have a

13    gripe, they are going to go through the grievance

14    procedure.

15              If in fact Mr. Kelly is telling me something

16    that is not so, the company can quite easily come back

17    with another affidavit and I will deal with the issue

18    directly.   Now, Mr. Bennett.

19              MR. BENNETT: This issue, your Honor, appears

20    to be arising serially, and although in the pleadings

21    the discussion focused on three sites in Maine and New

22    Hampshire, there is an ongoing construction project in

23    Boston where again a similar issue had to be dealt with

24    at 8:30 this morning.

25              THE COURT:  That is not before me,  Mr.

1   Bennett.

2            MR. BENNETT: But it is on the issue of

3   mootness,  your Honor. There was a threat of another

4   work stoppage.

5            THE COURT:  I know the names of some judges

6   down in Boston that would be happy to hear you on that.

7   That is not an issue on these sites.  You gave me

8   information on three sites and I'm advised by the

9   attorney of the Union representative that he is fully

10  authorized to make this representation.  I'm sure he

11  would not make it absent clear knowledge of what he is

12  saying.

13           As far as the Union is concerned that issue

14  is resolved as far as work stoppage is concerned. If

15  they want to continue this issue,  and he tells me and

16  I'm not hearing him object to anything that I'm saying,

17  they will proceed pursuant to the grievance procedure

18  outlined in the Union contract.  Based on that I can't

19  see anything other than the fact that this issue is

20  moot.

21           If I'm wrong, and he is wrong, I'm not going

22  to prejudice the company.  They are free at any time to

23  come back to me and show me that what I'm hearing is

24  false.

25           Now, I know that the Union is not going to

1    make them do that because they don't want to get the

2    judge mad.  They are giving me representations that that

3    is not the case. So it appears to me that rather than to

4    destroy a lot of trees, everybody is working, Otis is

5    building elevators, people are making their wages and

6    let the economy move.  Mr. Copeland?

7              MR. COPELAND, My response to that is I don't

8    think the assurance we have heard this morning meets the

9    test in the First Circuit for mootness, and I'm

10   referring to a decision entitled General Dynamics versus

11   Local 5 of the Marine and Shipbuilding Workers, 469 F.2d

12   848. The relevant language appears on page 852 and it

13   deals with this very issue where the Union had returned

14   to work in the face of an injunction proceeding and the

15   Court observed:  "We are far from sure that other work

16   stoppages in violation of the no strike clause will not

17   occur during the remaining term of this agreement.."

18              It seems to me that it is one thing for Mr.

19   Kelly to say there won't be work stoppages over this

20   particular dispute, but the General Dynamics decision

21   seems to recognize that this is not moot where there is

22   an indication, or unless the Court is far from sure that

23   other work stoppages on other issues won't occur during

24   the remainder of the agreement.

25              THE COURT: Your argument to me is that even

16

1    though this issue is moot, there may be other issues

2    that I don't know about that may occur in the future

3    that I should enjoin now.

4                I will not do that.  My decision -- don't

5    argue, you're going to win.

6                This matter is moot.  I'm not going to issue

7    the TRO.

8                Counsel is free to return to me if in fact

9    the representations I hear turn out to be false.  That

10   is where we stand.  I've got the papers here, there is

11   no need to refile,  I've got them and hopefully that

12   will take care of this problem.  Anything else, counsel?

13   Plaintiff's?

14                MR. COPELAND: No your Honor.

15                THE COURT: Defense?

16                MR. MATISOFF: No, your Honor.

17                MR. KELLY: No.

18                THE COURT: Thank you all.  We're off the

19   record.

20                (Proceedings were concluded at 9:55 AM).

21

22

23

24

25

17

```
1              CERTIFICATE

2        I hereby certify the foregoing is a true and

3    accurate  transcript of my stenographic notes taken at

4    the time and place herein set forth.

5        Dated at Portland, Maine this 15th day of April

6    2004.

7

8                    Official Court Reporter.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT B**

1

1                        UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2

3

4     OTIS ELEVATOR COMPANY,          )
                         Plaintiff,   )
5                                     )
                                      )
6     vs.                             )    CA No. 05-11213-NMG
                                      )
7                                     )
      LOCAL 4, INTERNATIONAL UNION    )
8     OF ELEVATOR CONSTRUCTORS,       )
      et al.,                         )
9                        Defendants.  )

10

11    BEFORE:  The Honorable Nathaniel M. Gorton

12

13      EMERGENCY HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER

14

15

16               John Joseph Moakley United States Courthouse
                         Courtroom No. 4
17                       One Courthouse Way
                         Boston, MA 02210
18                    Thursday, June 9, 2005
                          5:08 P.M.
19

20

21

                     Cheryl Dahlstrom, RPR, RMR
22                    Official Court Reporter
              John Joseph Moakley United States Courthouse
23                One Courthouse Way, Room 3209
                        Boston, MA 02210
24         Mechanical Steno - Transcript by Computer

25

2

```
 1    APPEARANCES:

 2         MORGAN, BROWN & JOY, LLP
           By: Laurence J. Donoghue, Esq., and
 3             Amy Carlin, Esq.
           200 State Street
 4         Boston, Massachusetts 02109-2605
           - and -
 5         DOWNS RACHLIN MARTIN PLLC
           By: Timothy E. Copeland, Jr., Esq.
 6         80 Linden Street
           P.O. Box 9
 7         Brattleboro, Vermont 05302-0009
           On Behalf of the Plaintiff.
 8
           SEGAL, ROITMAN & COLEMAN
 9         By: Paul F. Kelly, Esq.
           11 Beacon Street
10         Boston, Massachusetts 02108.
           On Behalf of the Defendants.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2          THE CLERK:  This is Civil Action 05-11213, Otis

3    Elevator versus Local 4, et al.  Counsel please identify

4    themselves for the record.

5          MR. DONOGHUE:  Laurence Donoghue from Morgan, Brown &

6    Joy for the plaintiff.

7          THE COURT:  Good afternoon, Mr. Donoghue.

8          MS. CARLIN:  Amy Carlin from Morgan, Brown & Joy for

9    the plaintiff.

10          THE COURT:  Miss Carlin.

11          MR. COPELAND:  Your Honor, I'm Tim Copeland, Downs

12    Rachlin Martin, Brattleboro, Vermont.

13          THE COURT:  Good afternoon to you, Mr. Copeland.

14          MR. KELLY:  Good afternoon, your Honor.  My name is

15    Paul Kelly, Segal, Roitman & Coleman, Boston.

16          THE COURT:  Good afternoon to you, Mr. Kelly.  We're

17    here on plaintiff's motion for a temporary restraining order

18    which, of course, is normally something that is filed with me

19    ex parte.  I take it you have received notice of this, Mr.

20    Kelly, and that you are here to represent Local 4, the

21    International Union of Elevator Constructors, is that correct?

22          MR. KELLY:  That's my client, your Honor, that's

23    correct.  As a matter of fact, we were here in Boston this

24    morning for an arbitration with Otis, and they decided to call

25    it off because they said we needed to come over and see you.

4

```
 1           THE COURT:  All right.  So we're here.  Even though
 2    it's on a motion for temporary restraining order, both sides
 3    are represented.  And that is helpful because it means we will
 4    hear both sides' argument.
 5           I have read, in the very brief period of time that
 6    I've had this matter before me -- which has been about half an
 7    hour -- the plaintiff's motion for a temporary restraining
 8    order; the memorandum of the plaintiff, Otis, in support of
 9    its application for a temporary restraining order; and, of
10    course, they have submitted with their papers a draft
11    temporary restraining order and an order to show cause.
12           I have read that -- those papers thoroughly, Mr.
13    Kelly, and it does seem to me, on the face of the papers, that
14    they have presented a legitimate case for a restraining order.
15    And I want to hear from you as to why I should not enter it.
16           MR. KELLY:  A couple reasons, your Honor.  And I
17    think the first is, the case doesn't belong here.  This is a
18    case involving people working in Bangor, Maine.  We have no
19    dispute between the local and the company that the employees
20    of Otis, in Bangor, don't have the right to strike in order to
21    force Otis to do what they want to do.
22           We don't dispute that.  What Otis says is what we
23    want:  to get the men back to work.  The local -- if you've
24    read the pleadings, you'll see that we sent a directive up to
25    Maine that everybody should go back to work.  They don't have
```

1    any right.  They're doing it at their own risk.

2         THE COURT:  Where does it say that in any of the

3    papers that I've seen?

4         MR. KELLY:  I believe it was attached to Mr.

5    Powilatis' declaration.

6         THE COURT:  Well, I haven't read any declarations.  I

7    have read what I told you I've read, and that's all I have.

8         MR. KELLY:  Let me read it to you.  It is from the

9    business manager of Local 4.  It says, "Dear brothers and

10   sisters" -- it's addressed to all IUEC members currently

11   employed by Otis Elevator.  "It has been brought to my

12   attention by Otis management that many of you have decided to

13   take time off, call in sick or otherwise choose not to take

14   your work assignment during the current labor unrest.  I must

15   inform you that you have no protection under the current Otis

16   Elevator Company agreement for making these personal choices.

17   I urge you to return to work immediately.  This is a directive

18   from the Local 4 office."

19        THE COURT:  And that's issued to all union members in

20   Maine or all Local 4 members throughout the local?

21        MR. KELLY:  Maine probably, right?

22        FROM THE GALLERY:  Otis.

23        MR. KELLY:  Otis members.  Let me just address that

24   point, though, your Honor.  Maine, all right -- and our

25   history with Otis over the last couple of years started with

6

```
 1    their application for a TRO up in Maine last April.  They

 2    didn't do so well.  That's why we're here.

 3            Maine assigns work out of Westbrook.  It is near

 4    Portland.  People work up in Bangor.  That's what this is all

 5    about.  They work out of the Westbrook, near Portland.  And

 6    out of that same office they get work in Manchester, New

 7    Hampshire.  So this Westbrook office controls that area.

 8            There has been a problem up in Maine.  The papers

 9    show you what that problem is.  It is a problem that Otis

10    doesn't want to deal with, apparently; and, therefore, they're

11    coming to you.

12            They called Local 4 and they said we've got problems

13    up here so do something.

14            THE COURT:  Who "they" called?

15            MR. KELLY:  This is -- I think it's Mr. Christensen,

16    whose name is in the papers saying, Come on, help us.  That

17    letter went out pursuant to that phone call.

18            In addition, the business manager of Local 4 called

19    the people up in Maine.  They do have concerns over this

20    member -- or this former member that Otis wants to force them

21    to work with.  They don't work with him, Otis can discipline

22    them.  That's what the papers say.  Let them do that.

23            THE COURT:  There's a grievance procedure and there's

24    a Collective Bargaining Agreement and arbitration is called

25    for, right?
```

7

1          MR. KELLY:  That's how it happens.  We don't have any

2     dispute about that.  The company -- the company is looking for

3     some effective way to force its workers to go back.

4          Mr. Langer called the Manchester people yesterday

5     because Mr. Christensen said, I hear Manchester is going to go

6     out.  He called them last night and said, Hey, guys, you don't

7     have any right to go out there.  Stay in there.

8          So we do have a problem and it's up in the Bangor

9     area.  It's about 16 --

10          THE COURT:  And the -- enlighten me.  Local 4 is all

11     of New England?

12          MR. KELLY:  Well, Local 4 is Eastern Massachusetts.

13     There's a local out in Worcester.  It is -- it's clearly Maine

14     and New Hampshire.

15          THE COURT:  Okay.  Eastern Massachusetts, New

16     Hampshire and Maine.

17          MR. KELLY:  Correct.

18          THE COURT:  Okay.

19          MR. KELLY:  Correct.  And this particular problem --

20     now, if we are going to hear this problem, it seems to me it

21     would be important to hear from the workers who aren't

22     working.  Why aren't you?  And they'll tell you whatever the

23     problem is, and they'll tell you that Otis has -- you know, up

24     in Maine, they had a meeting and Otis has told them, if you

25     guys don't work for this -- if we assign you to work with this

8

```
 1    guy and you don't want to do it, you'll never work for Otis
 2    again.  So they all said we're going to be sick, whatever
 3    we're going to do.
 4         We're not saying they have a right to do it.  We're
 5    not saying that we disagree with Otis.  They can do what they
 6    want to do in terms of forcing them.
 7         THE COURT:  You started by saying the case doesn't
 8    belong here.  Why doesn't this court have jurisdiction?
 9         MR. KELLY:  Because -- well, you have jurisdiction.
10    Certainly, you have jurisdiction over Local 4.  But what are
11    you going to do to Local 4?  Tell Local 4 to tell the guys to
12    go back to work?  We've already done that.
13         If what Otis is looking for is a order running to the
14    workers up in Maine, they probably should go up to Maine to
15    get that order.  And if they're going to have to be heard,
16    they ought to be heard --
17         THE COURT:  If you have been ordered to do everything
18    that they're asking you to do, what harm is there to enter the
19    temporary restraining order?
20         MR. KELLY:  Say it again.
21         THE COURT:  If you've already agreed that what the
22    Otis folks want you to do you've done, what harm is there in
23    entering the temporary restraining order?
24         MR. KELLY:  Well, I mean, I would never agree to any
25    temporary restraining order that -- I haven't even read this
```

9

1  one, to be honest with you.  But they spin them out and it's

2  got more language in it than is ever necessary to address any

3  problem.

4        But we don't -- we don't have a predicate for a Boys

5  Market injunction.  You've got to have a dispute between the

6  union and the company.  We don't have that here.  The

7  company's got a problem.  Our information is they created

8  their own problem because this fellow up in Maine, who decided

9  he didn't want to be a member of the union anymore, was aided

10  in that by Otis.

11        THE COURT:  Are you saying that there is no

12  coordination with respect to these employees, these union

13  members, in the Maine area, as to a decision not to take

14  assignments and to call in sick?  There's no coordination at

15  all?

16        MR. KELLY:  I'm sure they're coordinated among

17  themselves.  I'm think they are.  I would say that's concerted

18  activity.  But it isn't concerted activity that the local is

19  responsible for.  The local has called them and said, look

20  at -- we've written them and said you don't have any right to

21  do this.  That doesn't mean that Local 4 is on strike.  When

22  we're on strike, the company knows it.

23        Irreparable harm, your Honor -- and I've done a lot

24  of these with this company.  This is Otis Elevator, United

25  Technologies.  They have locked out 300 elevator constructors

1     in the City of New York since March 17th.

2            THE COURT:  Well, that dispute isn't in front of me.

3            MR. KELLY:  I understand that.  But the question --

4     one of the questions that is in front of you is, has this

5     sick-out by 16 workers in Maine irreparably harmed one of the

6     largest companies in the world?

7            The reason I point out we've got 300 elevator

8     constructors locked out in New York is because the answer is

9     no.  There is no irreparable harm.  Let's get a judge to issue

10    an order, and that's how we do labor relations.  The judge up

11    in Maine -- I forget his name.  I apologize -- last year said,

12    I'm not doing it.  I'm not going to be your labor relations

13    consultant and go through and settle all your problems up

14    there.  That's why this case was filed as a related case with

15    you.  They're not going to get any relief up in Maine.

16           THE COURT:  It was filed as a related case to the

17    case that was assigned to me that was originally with Judge

18    Tauro, that is, Civil Action 04-11108, is that right?

19           MR. KELLY:  They didn't give me the cover sheet, but

20    I assume that's what they did.

21           THE COURT:  Well, let me hear from the attorneys from

22    Otis.  Who's going to speak?  Mr. Donoghue.

23           MR. DONOGHUE:  Your Honor, I had filed a motion pro

24    hac vice for Mr. Copeland, and I'd request that he be given

25    the opportunity --

1          THE COURT:  Yes.  Mr. Copeland may address the Court

2     as long as these papers are in the process of being filed even

3     if not completed yet.

4          MR. DONOGHUE:  Thank you, your Honor.  They have, in

5     fact, been filed and the fee has been paid, your Honor.

6          THE COURT:  Mr. Copeland.

7          MR. COPELAND:  As to the question, your Honor, why is

8     this a related case, there are actually two prior cases that

9     are currently pending before your Honor, both of which arise

10    out of this collecting bargaining relationship, both of which

11    arise out of strikes by this union, both of which occurred in

12    May of last year.  One of them found its way up to the First

13    Circuit.

14         THE COURT:  And I am in receipt of a mandate from the

15    First Circuit and have under advisement that case.  Will you

16    advise me, if I had entered the order as mandated by the First

17    Circuit in that case, would that have impacted this one?

18         MR. COPELAND:  Well, that's probably a question

19    better directed to the union than me.  But I will say this:

20    That's not the only case in which there is currently a

21    preliminary injunction in place against this union; and, yet,

22    here we are again.  The ink is barely dry on the First

23    Circuit's judgment and we have another issue here, another one

24    with Judge Stearns in Thanksgiving of last year when the

25    union --

```
 1            THE COURT:  So you're suggesting that even had I

 2      entered an order in compliance with the mandate of the First

 3      Circuit, it would not have impacted this issue?  We would

 4      still be here this afternoon?

 5            MR. COPELAND:  Well, would the union have recognized

 6      that there was an injunction in place, that it should not

 7      violate the terms of by striking again?  I don't know.  I will

 8      say this:  If that mandate had issued, there would be an

 9      injunction in place that would have prohibited what's going on

10      here.

11            THE COURT:  Why are you here and not in Portland,

12      Maine?

13            MR. COPELAND:  Well, fundamentally, because the

14      dispute here is with Local 4, which is here in Dorchester.  I

15      can't agree at all with Mr. Kelly's characterizations of the

16      union's involvement or, I guess, lack of involvement, as he

17      would put it.

18            As our papers, I think, make clear, the root of this

19      dispute begins with an individual who decided he no longer

20      wanted to be a Local 4 member; and beginning on the evening of

21      a union meeting in late April of this year, he began to

22      receive a series of harassing and discriminatory

23      communications from union members.  And it would at least

24      appear that those phone calls began at the time of this union

25      meeting.
```

```
1              I understand that the Court hasn't had the time to
2    review all of the declarations yet, but I would invite your
3    attention to Mr. Peterson's in which he describes an incident
4    in late May when he was having trouble getting employees that
5    were current Otis employees to be willing to work with this
6    guy.  I'll get to why we think that's the case in a minute.
7    But got in touch with an employee and said, I have a job for
8    you.  Will you please proceed to Bangor.
9              When he talked to the employee, the employee's
10   response was, yes, I will.  I'll be there tomorrow.
11             THE COURT:  That's Smith?
12             MR. COPELAND:  That's Mr. Peterson, referring to
13   employee Burpee.
14             THE COURT:  Okay.
15             MR. COPELAND:  Later in the day, and apparently after
16   a discussion that he had with one of the Local 4's officials,
17   the employee called back and said I've got something I've got
18   to deal with.  I'm not going to be there tomorrow after all.
19   And later told his supervisor that he had been told by the
20   union that if he was directed to work with this individual,
21   this Mr. Gorrecki, he really ought to think about whether he
22   ought to do that.  Ultimately, apparently, he did and,
23   ultimately, thought about it and didn't ever report to work
24   for Otis.
25             Mr. Hogue's affidavit quotes another employee, "My
```

1    word to the union is worth more than my money or my job."  He

2    was referring to what he would -- how he would resolve the

3    conflict that would arise if he were directed to work with Mr.

4    Gorrecki.  "I promised my brothers and sisters in the union I

5    would not work with Mr. Gorrecki."

6         Mr. Powilatis' affidavit, in Paragraph 7, refers to

7    an offer that was extended to him earlier today, that if Otis

8    made certain concessions, Local 4's business manager would get

9    employees back to work.

10         We don't think -- we don't view this case at all the

11    way Mr. Kelly does.  There does appear to be a dispute.  The

12    union appears to take the position that if Otis disciplines an

13    employee for refusing to work with this individual or for

14    harassing him that that discipline is somehow improper and

15    ought to be rescinded.  That was one of the demands that was

16    made today.  Take away that discipline and we'll get them back

17    to work.

18         THE COURT:  How do you respond to his suggestion that

19    this isn't a union matter at all?  These are rogues that are

20    not acting at the behest of the union, that this isn't a

21    dispute between Otis and the union.  It's a dispute between

22    you and 16 cowboys in Maine.

23         MR. COPELAND:  My initial response is it's a few too

24    many cowboys for that theory to hold much water.  Beyond that,

25    we think that the comments that were made to Mr. Powilitis

1    today clearly demonstrate what we thought all along about

2    who's in control of whether these employees work or not.

3          We think it started with the union beseeching

4    employees to get together and show some solidarity vis-a-vis

5    that member who didn't want to work.  And the inevitable

6    happened.  They're doing exactly what they're encouraged to

7    do.  It may be that we don't have the statement of a union

8    official who has been willing to step forward and say, I

9    ordered this strike.  We don't very often have that.

10          But I guess I would finish responding to that

11    question with an observation that I'm not sure the law

12    requires that kind of fingerprint evidence.  In this case --

13    this is on Pages 9 and 10 of our memorandum -- there's clearly

14    more than some indication of union activity or pursuit of

15    union goals.  It is abundantly clear that the issue that's

16    driving this is that a fellow resigned from membership in this

17    union and the one defining characteristic that defines

18    everybody that has directed harassing and discriminatory

19    conduct at him is that they're all union members.  An unusual

20    pattern of absenteeism, to say the least.  This is not just

21    Bangor.  This is all of Maine currently.

22          Three, the union either orchestrated the events or

23    failed to disavow and urge its members back to work.  On that

24    point, I would like to address briefly this letter that Mr.

25    Kelly brought to the Court's attention.  I had a discussion

1    with Mr. Kelly about this letter earlier today, and my client

2    had a discussion with his as well.  And I'll tell you about

3    mine, and I believe that the other discussion went much the

4    same way.  That is, are you telling us that you sent a letter

5    to employees?  They're not working now.  What have you done to

6    get this -- actually see that this letter gets to them?  The

7    response I got was, I think that it was put in the mail to

8    them.

9            Your Honor, it's Thursday morning.  If this was put

10   in the mail to them today -- and that wasn't even confirmed --

11           THE COURT:  Actually, it's Thursday late afternoon so

12   the record is clear.

13           MR. COPELAND:  I misspoke.  You're right.  When I was

14   having this discussion it was Thursday morning.

15           If the letter was, in fact, mailed out this morning

16   -- and that wasn't confirmed -- they're not going to get it

17   until Monday.

18           We were concerned about this -- and this isn't in the

19   papers.  It's something that came to our attention after we

20   filed the papers.  We've done what we can to address that

21   issue.  We had a supervisor get on the phone with his

22   employees and read them the letter.  The two employees that he

23   got ahold of said, This is the first I've heard about this

24   letter, and I'm not going back to work.  They were not

25   prepared to take it on the word of the Otis superintendent

1    that the union was -- had sent a letter like this.

2         So my response to that is this falls far short of

3    disavowing any kind of strike.  At best, they're going to get

4    this, if they check their mail, on Monday.

5         THE COURT:  How is the giant, as Mr. Kelly describes

6    your client, this giant organization, irreparably harmed by

7    the failure to report to work of 16 employees in the state of

8    Maine?

9         MR. COPELAND:  Well, there are two ways.  One, the

10   law in the First Circuit recognizes that the harm that would

11   -- it would suffer to its business relationships if, for

12   example, it's on a schedule to construct elevators and it

13   can't meet that schedule because these employees aren't

14   working, and it loses that job, it loses that goodwill with

15   that customer, or it doesn't get another contract with that

16   customer.  And that is the case -- that possibility is very

17   real, particularly on one job involving the University of New

18   England and a customer called -- I'm going to mispronounce

19   this, I apologize -- Ouellette, I believe, Construction

20   Company.  It's in our papers.

21        Now, might it be that Otis is big enough that it can

22   afford the loss that it will sustain if it loses a customer?

23   Perhaps.  But that doesn't mean that that harm isn't harm --

24   is not harm of a type that can be -- that is irreparable in

25   the eyes of the law.

1          Second, service.  And here, the law recognizes that

2     the Court should consider not just the harm to us, the

3     defendant, but the harm to others.

4          And I need to bring to the Court's attention

5     something else that came to our attention after the papers.

6     As is indicated in the papers, some of the individuals that

7     are involved in this work stoppage are mechanics whose job is

8     to provide service to existing elevators.  They're not

9     building new elevators.  They're keeping current elevators

10    running.  And their job is to go around from elevator to

11    elevator, do some routine maintenance, but, more importantly,

12    to be in a position to respond when one of those elevators

13    malfunctions, which they do from time to time.

14          When an elevator malfunctions with a passenger

15    trapped inside, that is referred to as an entrapment.  Today,

16    in Portland, Maine, there have been two entrapments reported

17    to Otis.  The employee that was supposed to be in position to

18    respond to that entrapment was on strike.  Had the employee

19    been in position, he would have been no more than a few

20    minutes away from that entrapment, depending on which of his

21    calls he was at.  But a few minutes -- a few minutes away and

22    he could have gotten that person out.

23          As it was, with this work stoppage, we have three

24    Otis superintendents doing their best to cover the entire

25    State of Maine.  Fortunately, on one of those entrapments, the

1    superintendent was able to get there within an hour and get

2    the person out.  That's still an unacceptable delay, and it's

3    the kind of delay that threatens very serious harm because the

4    longer people are trapped in elevators, the greater the

5    likelihood that they're going to do something unwise, not

6    being trained elevator personnel, to try to get themselves out

7    of the elevator.

8         We don't know -- we have not heard, as of the time

9    that we came into this courtroom, what had happened with the

10   second entrapment.

11        THE COURT:  Mr. Copeland, what about the overblown

12   authority that Mr. Kelly -- who says he hasn't read your draft

13   temporary restraining order, nevertheless, claims that it is

14   overblown.  Why is it not overblown?

15        MR. COPELAND:  Why is it not overblown?

16        THE COURT:  Yes.

17        MR. COPELAND:  Because, your Honor, it is doing

18   exactly what Boys Market and this court just about a month ago

19   said was the appropriate thing to do.

20        THE COURT:  You mean the First Circuit Court of

21   Appeals or --

22        MR. COPELAND:  Yes.  I apologize.  And that is, order

23   the union back to work and order the parties to arbitrate the

24   dispute that was triggering the union to strike in the first

25   place.

1            And I'm not sure what else Mr. Kelly was referring

2       to, but it certainly is complete in the sense that we want any

3       kind of strike activity stopped, and the order contemplates

4       that strike activity can take many forms and we've tried to

5       address them all.

6            THE COURT:  Why does the order at the bottom of the

7       first place say "escalators in Boston, Massachusetts"?

8            MR. COPELAND:  Well, I have to confess, your Honor, I

9       think that that was a typographical error and it should say

10      "Maine."

11           THE COURT:  It should say "Maine" and not "Boston"?

12           MR. COPELAND:  Yes.

13           THE COURT:  Okay.  I'll give Mr. Kelly one last shot

14      as to why I shouldn't enter it as amended to refer to Maine as

15      opposed to Boston, Massachusetts.

16           MR. KELLY:  Well, if I could find it in this package,

17      your Honor, I'll go through it with you.  The order that the

18      First Circuit reviewed was a very simple order.  It wasn't --

19      I'm not going to characterize.  I'll find -- it goes on for

20      pages.

21           It's a very simple order.  If there's an arbitrable

22      dispute -- and I don't think we have one here.  If you can

23      find one, I'd like to know what it is, but I haven't heard

24      one.   If we have an arbitrable dispute and we are on strike

25      over that dispute, we are obligated to arbitrate it under the

1    terms of the Collective Bargaining Agreement.  No question

2    about it.  If there is one here, I'd like to know what it is

3    and we'll arbitrate it.

4         THE COURT:  What do you say the arbitrable dispute

5    is?

6         MR. COPELAND:  Well, it's been articulated to us by

7    union officials and members that they take the position that

8    Otis cannot discipline an employee for refusing to work with

9    this fellow.  Now discipline --

10         THE COURT:  This is the issuance of a written warning

11    to Apprentice Smith for his failure to take an assignment to

12    work with Mr. Gorrecki?

13         MR. COPELAND:  Yes, your Honor.  And discipline is,

14    I'm sure --

15         THE COURT:  Why isn't that an arbitrable dispute?

16         MR. KELLY:  There's no question that the discipline

17    of an employee is an arbitrable dispute.  The question is,

18    does the -- is the local -- is the local on strike over that?

19    And the answer to that is no.  And what I heard said was --

20         THE COURT:  So what has caused these 16 workers to

21    fail to go to work?

22         MR. KELLY:  I think -- I agree with you, that that

23    problem with assigning somebody to work with this fellow, he's

24    refusing and then he gets disciplined, that that triggered it.

25    I don't disagree with that.  I think that's the problem.

1          THE COURT:  But you're just saying 16 workers a union

2     does not constitute, is that it?

3          MR. KELLY:  What I am saying is Local 4 didn't direct

4     these fellows to stay out of work.  The company is trying to

5     tell you, well, we tried to settle it this morning -- and my

6     brother, kind as he was to refer to a conversation with me,

7     didn't finish it.

8               I went back to Mr. Langer and asked him what

9     happened.  He had also made telephone calls.  We talked about

10    this.  But what really happened -- what really happened this

11    morning is that this company was trying to prove that the

12    local was responsible for the strike, so the conversation with

13    Mr. Copeland -- this is labor relations by injunction.  That's

14    what this company has been doing for the last year.

15              The conversation between me and Mr. Copeland all of a

16    sudden now is evidence that somehow the local's responsible

17    for this strike.  The local isn't.  There's no evidence of

18    that.  Yes, they're local members and, yes, it's important to

19    them that they not be assigned with this guy who's turned his

20    back on them.

21         THE COURT:  Well, I think it is evident that the 16

22    union members in Maine ought to go back to work.  I think we

23    all agree with that.

24         MR. KELLY:  Or they should be disciplined for not

25    going to work.

1           THE COURT:  Or -- maybe.  Maybe that's something else

2       that should happen.  But the first order of business is to see

3       that they go back to work in Maine if they have vacated their

4       jobs as a result of discipline exercised against an

5       apprentice, which, as far as I can tell from the papers I have

6       in front of me, is what the case is.

7           MR. KELLY:  I agree with you.

8           THE COURT:  I'm going to give you an opportunity to

9       convince me otherwise very soon.  But in the meantime, it is

10      my authority and my understanding as to what I should do that

11      I'm going to order those workers back to work in the way that

12      the plaintiff, Otis Elevator Company, has requested me to do,

13      as amended.  I'm not going to order them to go back to work in

14      Boston, Massachusetts, but with respect to the amended

15      temporary restraining order, to order those workers to go back

16      who are currently vacating their jobs, absenting themselves

17      from their jobs in Maine.  I'm going to give you an

18      opportunity --

19          MR. KELLY:  I don't think you have the authority to

20      do that.

21          THE COURT:  -- to come back.  You can tell me how

22      soon you want to come back and have a full-blown argument on

23      the preliminary injunction.  We're only talking about a

24      temporary restraining order.  That can be ten days or less.

25          We'll have to work out a schedule because I'm going

1    to be out of town part of next week.  But a week from now, or

2    a week from tomorrow, we could have a hearing on the

3    preliminary injunction.  Is that acceptable to counsel?  A

4    week from tomorrow, Friday, whatever that date would be.  The

5    17th of June.

6            MR. KELLY:  I'm on trial with Judge Young all of next

7    week, I believe.

8            THE COURT:  Well --

9            MR. KELLY:  A trial which started last week and we

10   didn't have it this week.  I think I'm spoken for all of next

11   week.

12           THE COURT:  As I recall, Judge Young doesn't try

13   after 1:00 in the afternoon, so we have the afternoon

14   available.

15           MR. KELLY:  That's right.  It's 9 to 1.

16           THE COURT:  What about 3:00 on Friday, July 17th --

17   June 17th?  Well, if you would prefer to delay it till the end

18   of the following week, that's your choice.

19           MR. KELLY:  I'd much prefer to delay it to the end of

20   the following week.

21           THE COURT:  All right.  Let's do it, then,

22   Thursday -- two weeks from today would be what date? -- the

23   23rd of June.  What's my schedule look like that afternoon?

24   3:00 on Thursday, June 23rd.  That better for you, Mr. Kelly?

25           MR. KELLY:  That would be much better for me, your

1    Honor.  Thank you.

2        THE COURT:  We will enter a temporary restraining

3    order for 14 days, from now until, let's say, 5 p.m. on

4    Thursday, June 23rd.  And it will be in the form as requested

5    by the plaintiff, with the amendment on the first page.  Where

6    it says, "Boston, Massachusetts," it will mean in the State of

7    Maine.

8        MR. COPELAND:  Yes, your Honor.

9        THE COURT:  And then there are some other fill-ins

10   that we need to take care of.  This will not exceed a period

11   -- on the bottom of Page 2, it will be 14 days or until 5 p.m.

12   on Thursday, June 23rd.

13       And then there is a provision for the posting of a

14   bond.  What about that, Mr. Copeland and Mr. Kelly?

15       MR. KELLY:  Last one was $10,000, I think, your

16   Honor.

17       THE COURT:  Any problem with that, Mr. Copeland?

18       MR. COPELAND:  Only that we can have enough time to

19   make arrangements.

20       THE COURT:  Yes.  You'll have time.  How much time do

21   you need to post a $10,000 bond?

22       MR. COPELAND:  By Monday or Tuesday?

23       THE COURT:  Let's say Monday.

24       MR. COPELAND:  Okay.

25       THE COURT:  By Monday, June -- what is that? -- 13th,

1    at 5 p.m., a $10,000 bond will be posted by Otis Elevator

2    Company, to secure any damages that might occur to the union

3    for an inappropriate injunction.

4         Then with respect to the papers to be filed in

5    connection with the injunction, the plaintiff -- rather, the

6    local, the defendant, will have until when to file?  What time

7    frame do you want, Mr. Kelly?  It's got to be enough in

8    advance of the hearing for the plaintiff to respond to your

9    papers if you choose to file them, and in front of the time

10   for the hearing.

11        MR. KELLY:  I would ask for the following Monday,

12   whatever that is.

13        THE COURT:  In other words, Monday, the -- it would

14   be June 20th.  June 20th, right?  By noon.  And the plaintiffs

15   will file by noon on Wednesday, the 22nd, any papers in

16   support of the dissolution of the injunction, or the temporary

17   restraining order is what you're asking for, and for the

18   retention of that injunction or the imposition of a

19   preliminary injunction, which is what Otis will be asking for.

20        MR. COPELAND:  Yes, your Honor.

21        THE COURT:  Of course, in the meantime, I expect

22   counsel will try to resolve the matter themselves.  This is

23   something that ought to be resolved without the interference

24   of a court.  But it's going to be resolved one way or the

25   other as a result of this litigation.

```
 1          MR. KELLY:  Your Honor, I take offense, if I might,

 2     at Paragraph 5 of this temporary restraining order.

 3          THE COURT:  Paragraph 5 on Page 3?

 4          MR. KELLY:  Yes.  It's one thing to say we're

 5     restrained from calling a strike and encouraging it and that's

 6     fair enough.  That's what the contract says we're not supposed

 7     to do.  But to start saying we've got to be holding union

 8     meetings to tell the members that either the court issued an

 9     order or Otis forced us to issue orders, I don't think that's

10     our job.  I think if Otis wants to get this order served, let

11     them get it served.  It's not our job to be holding meetings

12     and --

13          THE COURT:  How do you propose to notify the members

14     of your union in Maine if it's not by having a meeting?

15          MR. KELLY:  We can let the members know, your Honor.

16     The members will know soon enough.  But this is -- you know,

17     it just -- they want to -- they want you to be managing the

18     union.  That's what they want.  It's offensive to me.  If

19     we're not supposed to strike, we won't strike.

20          THE COURT:  What language -- is it the language at

21     the top of Page 4 that's offensive?

22          MR. KELLY:  The bottom of Page 3, top of Page --

23          THE COURT:  What particular language?

24          MR. KELLY:  "Directed to take all reasonable means to

25     communicate and effectuate the provisions of the orders issued
```

1    by the court, including, but not limited to, the holding of

2    meetings with employees represented by Local 4 and the

3    issuance forthwith of appropriate notices of other

4    communications to the members, officers and agents of

5    defendant."

6         This is supposed to be an order, as I understand it,

7    to individual members telling them to go back to work.  What

8    this is is making the union -- finding the union guilty for

9    something we've not --

10        THE COURT:  Nobody is finding anybody guilty of

11   anything at this stage.  What I am trying to do is restore to

12   the status quo what I think the order ought to be while we

13   resolve the issue that has been presented to me in this

14   litigation.

15        MR. KELLY:  But the order --

16        THE COURT:  I'm not finding anybody liable, and I'm

17   not finding anybody guilty of anything other than, at this

18   stage, trying to restore the status quo ante.

19        MR. KELLY:  If you have the authority, your Honor, to

20   order these 16 people back to work -- and I understood that's

21   what you thought you were going to do -- then maybe that's

22   what you ought to do.  I'm not sure that the case law gives

23   you that authority, but that's a different order than this

24   one.

25        This is an order that says, Local 4, you have

1    violated your Collective Bargaining Agreement, and I'm going

2    to issue an order against you to cease you from violating it.

3    And we do not agree that we have been in that position and we

4    ought --

5            THE COURT:  If you can come up with language --

6    better language by which to effectuate the notice of these

7    employees and the authority that your union has to impose them

8    to return to their employ while this dispute is being

9    litigated, then I'll consider the language.  But as of now,

10   that's the language that I'm going to impose.  If you want to

11   submit to me by noon tomorrow amended language of Paragraph 5,

12   I'll consider it.

13           MR. KELLY:  If I were to submit you language, your

14   Honor, it would be amended language for that entire thing.  It

15   would be an order to Local 4 to communicate to its members

16   that the federal judge in Boston has ordered them to go back

17   to work.  That's what this is coming down to.

18           THE COURT:  Well, that's not what I'm ordering.  I am

19   ordering the union to inform those folks that they are to

20   return to work.

21           MR. KELLY:  That's the same thing, isn't it?  Isn't

22   that what I just said?

23           THE COURT:  Mr. Copeland, do you have a response to

24   that?

25           MR. COPELAND:  I detected some word parsing in the

1    way Mr. Kelly was describing what he would propose.  And this

2    all started with a union meeting, your Honor.  They can have

3    another union meeting.

4              THE COURT:  Well, as I've said, Mr. Kelly, if you

5    want to submit language to me by which you would amend the

6    method of notifying the employees about the -- about this

7    temporary restraining order, I will consider it.  But I don't

8    see that it is saying to your union that it is guilty of

9    anything or that liability has been determined or anything of

10   that nature.  What it is doing is trying to impose the status

11   quo before there was this sick-out.  And that's what I intend

12   to do.

13             MR. KELLY:  Can we put a period at the end -- after

14   "the court"?  "All reasonable means to communicate and

15   effectuate the provisions of the orders issued by the court,"

16   period.

17             THE COURT:  You mean in Paragraph --

18             MR. KELLY: 5.

19             THE COURT:  After the middle of the second line?

20             MR. KELLY:  Right.

21             THE COURT:  How do you respond to that, Mr. Copeland?

22             MR. COPELAND:  I think the order ought to have

23   something in it that describes how they're going to do that.

24   I think it -- you know, the inference I'm drawing from that is

25   that if employees don't come back to work Mr. Kelly is going

1     to say we didn't have meetings with them because you didn't

2     order us to.

3          MR. KELLY:  That's not what I'm saying.  Look at, I'm

4     not going to say they're going back to work either, Judge.  I

5     am going to say we're going to do what you tell us.  If you

6     tell us to communicate the order, we'll do it.

7          THE COURT:  The order is going to be as it stands.

8          Is there anything further?  We're adjourned.

9     (Whereupon, at 5:57 p.m. the hearing concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

32

```
1                    C E R T I F I C A T E

2

3

4            I, Cheryl Dahlstrom, RPR, RMR, and Official Reporter

5    of the United States District Court, do hereby certify that

6    the foregoing transcript, from Page 1 to Page 31, constitutes,

7    to the best of my skill and ability, a true and accurate

8    transcription of my stenotype notes taken in the matter of

9    Civil Action No. 05-11213, Otis Elevator Company vs. Local 4,

10   International Union of Elevators Constructors, et al.

11

12

13

14

15

16

17                         Cheryl Dahlstrom, RPR, RMR

18                         Official Court Reporter

19

20

21

22

23

24

25
```